Filed 2/22/24  Medel v. Oceanic Companies CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| RUT MEDEL, | D079551 |
| Plaintiff and Appellant, v. | |
| OCEANIC COMPANIES, INC. et al., | (Super. Ct. No. 37-2018-00000593-CU-OE-CTL) |
| Defendants and Appellants. | |

APPEALS from a judgment and orders of the Superior Court of San Diego County, Joel R. Wohlfeil, Judge.  Affirmed as modified.

Frost Brown Todd AlvaradoSmith, William M. Hensley; Law Offices of Michael Wright and Michael Wright for Defendants and Appellants.

Tashroudian Law Group, David A. Tashroudian and Mona Tashroudian for Plaintiff and Appellant.

## INTRODUCTION

A jury found Rut Medel was the victim of sexual harassment, sexual battery, retaliation for reporting sexual harassment, and wrongful termination in violation of public policy, among other causes of action, during her approximately nine months of employment at Oceanic Companies, Inc.

(Oceanic Companies), and Oceanic San Diego, LP (Oceanic San Diego) (sometimes collectively, Oceanic). Manoj Chawla, the president and CEO of Oceanic Companies, repeatedly tried to have sexual intercourse, including group sex, with Medel. Deepak Chokshi, the regional manager of Oceanic Companies, was also found personally liable for sexually harassing and sexually battering Medel. Medel was terminated after she complained about Chokshi's sexual battery and retaliation, and rebuffed Chawla's sexual advances.

The jury awarded Medel substantial damages for past and future lost income and past and future noneconomic loss, as well as punitive damages. Chawla, Chokshi, and Oceanic (sometimes collectively, defendants) moved for judgment notwithstanding the verdict (JNOV) and a new trial. Defendants argued in their JNOV motion that the evidence was insufficient to support the awards for past and future lost income and punitive damages. In their new trial motion, defendants asserted myriad grounds to support relief, including damages are excessive (Code Civ. Proc.,[1] § 657, subd. (5)), evidence is insufficient to justify the verdict and the verdict is against the law (*id.*, subd. (6)).

The trial court denied defendants' JNOV motion, ruling there was sufficient evidence to support the jury's verdicts. Defendants have not appealed this ruling. The court, however, granted their new trial motion as to damages, conditioned on Medel's agreement to remittitur of the amount of future lost income and punitive damages. It found the awards for future lost income against each defendant were "excessive in that the awards are not

---

[1] Unless otherwise indicated, all further statutory references are to the Code of Civil Procedure.

supported by a rational foundation in the evidence" and remitted each of those awards to zero damages.

As to punitive damages, the trial court concluded the reprehensibility of each defendant's conduct was "not so severe" that Medel was undeterred from accepting employment with Oceanic despite knowing of defendants' "unusual co-mingling of personal and business practices" and she had "participated in many of the same practices she criticized at trial." The court also found the ratio of punitive to compensatory damages unreasonable based on its view of the evidence of the defendants' financial condition. As a result, the court reduced the punitive damages awards against Oceanic Companies and Oceanic San Diego from $1 million to $326,360, representing a one-to-one ratio between punitive and compensatory damages. The court also reduced the punitive damages award against Chawla from $2 million to $652,720, a two-to-one ratio of punitive to compensatory damages. Medel accepted the remittitur, and the court entered the amended judgment, from which the parties have appealed.[2]

On appeal, defendants do not challenge the jury's verdicts on liability. Instead, they contend the trial court erred by not further reducing the punitive damages award against Chawla to a one-to-one ratio of punitive to compensatory damages, arguing his reprehensibility was "low to moderate." They also assert other grounds to support the further reduction, if not elimination, of the punitive damages awards; and claim the jury's awards for past lost income and noneconomic damages were also excessive.

---

[2]     The trial court also reduced the punitive damages award against Chokshi from $750,000 to $1,000. This remitted punitive damages award against Chokshi is not at issue in this appeal, as it is not challenged by either defendants or Medel in her cross-appeal.

In her cross-appeal, Medel contends the jury's awards for future lost income against all defendants must be reinstated because the trial court failed to supply an adequate specification of reasons or grounds when it eliminated the awards, as required by section 657; and the trial court erred when it remitted the punitive damages awards against Oceanic Companies, Oceanic San Diego, and Chawla. She thus seeks reinstatement of both categories of damages to their original amounts.

Addressing compensatory damages first, we conclude the trial court properly exercised its discretion when it refused to reduce the jury awards for past lost income and noneconomic loss. But we agree with Medel that the court failed to comply with section 657 when it eliminated the future lost income awards. We thus reinstate those awards to their original amounts as to each defendant.

Regarding punitive damages, we conclude the trial court erred in relying on the asserted conduct of the plaintiff, Medel, in assessing the degree of each defendant's reprehensibility for punitive damages. It is well established that a defendant's reprehensibility is to be determined on the basis of *his* tortious conduct, not the victim plaintiff. This principle applies with equal force as to the victim's asserted conduct in a sexual harassment action.

We nonetheless deny Medel's cross-appeal to reinstate the jury's original punitive damages awards, as the remitted awards appear reasonable based on the reprehensibility of the defendants' conduct and their financial condition. However, because we are reinstating the $60,000 compensatory awards for future lost income against Oceanic Companies, Oceanic San Diego, and Chawla, we will exercise our authority to increase the punitive damage awards against these three defendants as necessary to reestablish

4

the trial court's one-to-one ratio of compensatory to punitive damages against Oceanic Companies and Oceanic San Diego, and the two-to-one ratio against Chawla.[3]

FACTUAL AND PROCEDURAL BACKGROUND[4]

I.

*Trial Evidence*

A.     *The Parties*

Chawla is president and CEO of Oceanic Companies, which managed hotels he separately owned either wholly or partially.  At the time of trial, Oceanic Companies managed about 13 such properties.

Chokshi was regional manager of Oceanic Companies up until October 2016.  He reported directly to Chawla and supervised Medel.

Rubi Briceno worked for Chawla and Oceanic Companies, eventually becoming its vice president.  She recruited a majority of the employees for the various Oceanic properties, including Medel.

Medel worked for Oceanic[5] from June 5, 2016 to February 28, 2017, when she was terminated.

---

[3]     Although we are reinstating the jury's $30,000 future lost income award against Chokshi, we leave undisturbed the trial court's remitted $1,000 punitive damages award against him since no party has challenged that aspect of the trial court's new trial order.  (See fn. 2, *ante*.)

[4]     In summarizing the facts, "we view the evidence in favor of the judgment."  (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 693–694 (*Roby*).)

[5]     It appears Medel was officially employed by Oceanic San Diego for a period of time; it issued her final paycheck in February 2017.  Medel was also paid by other Oceanic entities, depending on where she was working during her nine-month employment.  For convenience, we will refer to her employer as Oceanic, inasmuch as Oceanic Companies oversaw and managed the

B.     *Medel's Testimony*

Medel met Briceno in 2010, when she was 15 years old.  They became "best friends."  In May 2016, at age 21, Medel was working as a bank teller in Santa Barbara County when Briceno and Chawla offered her a job at Oceanic.  A month later, Medel moved to San Diego and started employment with Oceanic as a front desk agent at its El Cajon hotel.

1.     *Events before the start of Medel's employment with Oceanic.*

Through her friendship with Briceno, Medel had known Chawla and Chokshi nearly a year and a half before her employment with Oceanic.

Medel first met Chawla in January 2015 when she visited Briceno in San Diego.  Briceno was unemployed and attending college full time.  Briceno told Medel that Chawla was her boyfriend, they dated "unofficially[ ] because he's married," and that he allowed her to live rent-free in a room at the El Cajon hotel.  According to Medel, Chawla was Briceno's "sugar daddy, where she gets paid . . . to provide whatever he wants sexually."

In October 2015, Medel accompanied Chawla, Chokshi, and Briceno on a trip to Las Vegas to celebrate Briceno's 21st birthday.  Medel was not yet 21.  All four of them slept in one hotel room with a single bed.  During the trip, Medel, along with Chawla, Chokshi, and Briceno, consumed alcohol and used cocaine.  Medel was not "surprised" by their partying and drug use when she started at Oceanic.  Chawla's and Briceno's motto was to " 'work hard, play hard.' "  But for Medel, "partying" did not include sex.

In April 2016, Chawla invited Medel and Briceno to his home, while his wife was out of town, to celebrate Briceno's acceptance into a study abroad

---

various separately operated Oceanic businesses including Oceanic San Diego, and the parties in their briefing refer to both entities as her employer.

program. Chawla and Chokshi were both there when Medel and Briceno arrived. That evening, Chawla, Chokshi, Briceno, Medel and others got drunk. Briceno took off all her clothes and got into a hot tub with Chawla. The two repeatedly asked Medel to join them. Although uncomfortable, Medel eventually agreed but refused to remove her bra and underwear.

In May 2016, Briceno and Chawla told Medel "they had just let some girls go" and they thought Medel would be "a good fit" for the company. It was not the first time they offered her a job but this time it was, "you're either taking it or not." Medel accepted the offer and moved to San Diego where, she explained, she had no one else other than Briceno.

2. *Events during Medel's employment with Oceanic.*

On June 5, 2016, Medel started employment with Oceanic. Once hired, she moved into Briceno's room at the hotel in El Cajon where they shared a bed and received free rent. At the same hotel, Medel started work as the front desk agent. Chokshi, as regional manager, supervised Medel.

In her first week on the job, Chokshi offered Medel beers, on work premises and during working hours, to "celebrat[e]" her hiring. She declined.

During her second week, Chawla invited Medel and Briceno to a business meeting in Laguna. They met Chawla and his business associate at a restaurant, ate with them and had a few drinks. After dinner, the four went to the associate's home. There, Chawla and his business associate, whom Medel described as being in his "late 50s, 60s," encouraged Medel to drink more alcohol. She took a shot of tequila and found it "disgusting." The two men "kept insisting" that she continue to drink and suggested they all get into the hot tub, just as they had done at Chawla's home in April 2016. Medel felt "pressured" to drink and to "loosen up," but she refused because

7

she felt "unsafe." Medel eventually left because Chawla got "upset" she was not drinking and he wanted to leave.

      a.     *The June 22, 2016 sexual battery by Chokshi.*

On June 22, 2016, Briceno invited Medel to go out for dinner and then to a club in the Gaslamp Quarter neighborhood in San Diego to dance. Briceno changed plans and told Medel to meet her at the Oceanic corporate office for a few drinks and they would then go with Chawla to eat.

When Medel arrived, she saw Chawla and Chokshi outside smoking cigarettes. She approached them to thank them and tell them she was "excited to start this new job and live in San Diego." That night she wore leggings that had a "slit on both the knee sides." Chawla and Chokshi "started complimenting" Medel on her body, telling her that she "looked good." Chawla asked her, "Do you have any more holes that we don't know about?," while tilting his head to "insinuat[e]" whether she "had any more holes in [the] vagina area of [her] leggings." Medel was shocked and disgusted by the comment, and went inside.

That evening in Chawla's private office at the corporate building, Medel took a video of herself and another female employee dancing. The video also showed Chokshi "rolling up a bill" and using it to snort cocaine that was on a table near Chawla's desk.[6] Chokshi was separating the cocaine into lines for all of them. Medel did cocaine that night, as did Chawla, Briceno, and another woman.

Medel left the office at about 2:00 a.m. because she had to work a 6:00 a.m. shift at the El Cajon hotel. As she was driving home, Chokshi called her cellphone and asked for a ride home. Medel agreed, turned

---

[6]    The record includes a transcript of the video but not the video itself.

around, and picked up Chokshi.  When she asked him for directions to his home, Chokshi "directed" her to get on the freeway towards El Cajon.  She asked him again where he lived; Chokshi told her he was staying at the El Cajon property that night, too.  As manager, Chokshi knew she lived at the hotel and her room number.

When they arrived, Chokshi followed Medel to her room.  Medel asked Chokshi what he was doing.  He responded that Briceno, Chawla, and a few others were returning to party in Medel and Briceno's room.  This frustrated and annoyed Medel because she had to work in the morning.  Medel let Chokshi into the living area of her hotel room and she went into the bedroom, which was separated by a door, and got ready for bed.  As she was changing, "he tried to come in."  She made him wait outside until she finished changing.  Chokshi wanted to use the bathroom and, because it was located through the bedroom, Medel let him enter to get to the bathroom.  Medel then got into bed and waited for Chokshi to finish but he stayed in the bathroom for "a while."  She started to fall asleep.

After falling asleep, Medel felt Chokshi's hand touching her "underneath [her] shorts and into [her] vagina," while he used his other hand to grab her breasts and nipples.  Medel "froze" as she awakened to his touching and then laid there in "shock."  Briceno then started banging on the outside door, as it had been "double-locked" from inside, ostensibly by Chokshi since Medel "never" double-locked the door from inside, as it prevented entry with a room key.  Chokshi jumped out of the bed and ran out of the room just as Briceno and Chawla entered.

Medel also jumped off the bed and told Briceno, "I'm so glad you came in when you did.  I don't know what would have happened."  Briceno was drunk and just looked at Medel, not understanding what Medel was saying.

9

Medel got back into bed and tried to sleep, despite feeling "disgust[ed]" and "embarrass[ed]" about what had just happened.

As Medel was trying to sleep, Chawla and Briceno got into bed next to her and started having sexual intercourse. Chawla then used his hands and leg to "caress[ ]" Medel's body, attempting to have her "join in." Medel demanded they stop or go to another room; they stopped after she told them a second time.

Medel felt "betrayed" and "scared" by what had happened, as she had moved to San Diego for the new job, lived in her employer's hotel, and felt "stuck" because she needed the income and had no one else to depend on.

The next morning, Chokshi came into work after Medel had started her shift. Although neither spoke a word, they acknowledged each other. Medel just did her work and "chose to brush that experience off and forget it." She explained it was not an option for her to complain about Chokshi's misconduct because he was her supervisor and manager, nor Chawla's because he was "the owner." Asked to explain further why it was not an option, she said: "Because I lived there. I worked there. I had never had anybody, not a parent, uncle, family members, help me out financially. So me even being there rent-free, a job, like initially I felt indebted to my friend, who I thought was my friend, and these men, who I thought were my friends too."

b. *Medel reports Chokshi's misconduct to a supervisor.*

Eventually Medel did report Chokshi's misconduct, first to Chawla's brother, Kushal Chawla,[7] and then to Chawla, as we later discuss.

---

[7]  To avoid confusion, we refer to Kushal Chawla by his first name.

Kushal helped his brother run the Oceanic business between July or August 2016 until September or October 2016. Although Medel did not know whether Kushal "officially" worked for Oceanic, she considered Kushal to be her supervisor, as he determined where she would work and set her work hours. After she refused Chokshi's advances, Medel began receiving "write-ups" and "was being accused of stealing" and other misconduct, including by Chokshi. Kushal asked Medel, "Why is he doing this to you?" Medel told Kushal that Chokshi was retaliating against her and trying to get her fired because she refused to have sex with him.[8]

c.      *The August 2016 incident.*

In August 2016, Medel went out with Briceno to the Gaslamp Quarter before Briceno left to study abroad. Chawla and Chokshi joined them. They had dinner and then went to bars in the area to have drinks. At some point Medel, Chawla, and Briceno went back to the El Cajon hotel. Medel got into bed, and as before, Briceno and Chawla also got into the same bed and started to engage in sexual intercourse. Again, Chawla tried touching and rubbing up against Medel's body, encouraging her to join them. Medel yelled at them to stop and to get another room. She was upset and felt "very powerless" because, she explained, "[h]e was the owner of this company, my boss." Chawla and Briceno eventually stopped and they fell asleep.

After Briceno left for abroad in the fall of 2016, Medel messaged Briceno that she was being wrongly accused of misconduct at work and

---

[8]     At trial, the jury received evidence of text messages between Medel and Kushal in which Medel told Kushal she received a write-up "because [Chokshi] is behind it. . . . They are just giving me writeups because [Chokshi] told them. He's obviously after me. And [when] you're gone, he's really going to find a way to get me out of here."

nobody was "sticking up" for her. On two occasions Briceno messaged Medel and asked her to get cash for her from Chawla because she had run out of money. Chawla had given Briceno $7,000, matching money Briceno had saved, before she left. While abroad, he sent Briceno another $1,000.

        d.     *Chokshi purportedly terminates Medel.*

On October 18, 2016, Chokshi purportedly terminated Medel from work at the El Cajon hotel. Medel reported this to Kushal, who told her not to worry and to go work at the Oceanic's La Jolla property. She went to the La Jolla property and worked there as a "store clerk."

        e.     *Medel reports Chokshi's conduct to Chawla in October 2016.*

In October 2016, Chawla terminated Chokshi's employment for apparently embezzling from the company. Right after, Chawla text messaged Medel and told her he had fired Chokshi, but to not tell anybody, including Oceanic's corporate office and human resources department. Medel explained this reinforced her belief that she could not complain to Oceanic's human resources department for "anything." That same month, Chawla told Medel, "[Chokshi] hated you. He wanted you out so bad." When Chawla asked Medel why Chokshi wanted her fired, Medel told Chawla he was upset with her because she had refused to have sex with him.

        f.     *Chawla promotes Medel to manager in December 2016.*

While Briceno was studying abroad from about September to December 2016, Medel did not spend time with Chawla or Chokshi. Medel explained the only reason she had "socializ[ed]" with the two men was because Briceno would bring them.

In December 2016, Chawla messaged Medel wishing her a happy birthday. At the time Medel was in Mexicali visiting her father. During the first week of January 2017, Chawla called Medel, asking about her trip to Mexicali and telling her he had never been to the city. Chawla then told

Medel, "We should take a trip down there to Mexicali. I want to go with you." Medel told Briceno about Chawla's message, calling it "random" and telling Briceno, "I don't hang out with the guy unless you're there. And also knows he can't do anything I won't tell you."

Sometime also in December 2016, Chawla promoted Medel to the manager of the Oceanic property in La Jolla, after she told Chawla she was "really depressed" and contemplating quitting Oceanic. She told Chawla she did not like "jump[ing] back and forth around," that is being "fired from one location and sent to the next." When she told Chawla she thought it was best if she looked for another job, he told her: "No, I brought you down . . . to be in a management position. I told you . . . I wanted you guys [i.e., Briceno and her] to oversee my companies, to grow." Chawla then offered her a manager position at the company's Motel 6. Although Medel had additional responsibilities as manager, she did not receive a pay increase.

g.    *The January 27, 2017 incident.*

In January 2017, after Briceno returned from studying abroad, Medel and Briceno moved out of the El Cajon hotel into a one-bedroom apartment, where they again shared a bed.

On January 27, 2017, Medel was getting ready to go to a party at the home of another employee who also worked at the Motel 6. Briceno told Medel she was coming to the apartment with Chawla to change her clothes, and the three of them would go to the party together. Before their arrival, Medel told Briceno, that if Chawla stayed over, Briceno and Chawla were "taking the couch" and "to not bring this man or any of her sexual activities with [her] in the bed."

That evening, as Briceno dressed in front of Medel and Chawla, Medel began talking about work. While sitting on their bed, Chawla said, "Come

13

girls, . . . Come sit with me." The two women sat on either side of him on the bed. He hugged them and said, "You know I love you two. You guys are my best girls. . . . I want you guys to represent me and my companies. I want you to be overseeing my company sites, eventually one day." Chawla then leaned back on the bed, pulling Medel and Briceno down with him. He then said, "Why don't we just stay in tonight." Medel understood "he was trying to have sex with [her] and [Briceno]." Medel and Briceno immediately got up and Medel responded, "No, Manoj." She had no interest in having sex with Chawla or being in the same bed with him and Briceno.

> h.     *Medel is terminated on February 28, 2017.*

On February 28, 2017, Medel was terminated. Medel was told, " '[Chawla] is not satisfied with your work.' " Medel, however, believed she was terminated in retaliation for, among other things, rejecting Chawla's attempt to get her and Briceno into bed with him on January 27, 2017.

On the day she was fired, Medel was asked to sign five or six "writeups" for what the company claimed was her poor work performance. Medel explained it was Oceanic's "customary practice" to use writeups to justify an employee's firing, as had occurred in January 2017 when, in Medel's role as manager, she had prepared a "bunch of writeups" for an employee who was being terminated from the hotel in La Jolla.

In addition to the writeups she received the day she was fired, Medel was also demoted from manager to front desk agent on February 7, 2017, purportedly because she had been unresponsive to a regional manager's attempts to contact her on February 6, when she was out of the country on her day off.

Medel received her final paycheck from Oceanic San Diego for $434.56. She was last paid an hourly rate of $13.50 per hour.

14

i.      *Events after Medel was terminated.*

After her termination, Medel went to Oregon and stayed with her mother.  She had intended to stay only a couple months but did not leave Oregon until December 2017.  There, she found herself unable to get out of bed and unable to control her sleep; she felt "embarrassed and humiliated" for being unemployed; she isolated herself in her room for months; and experienced self-loathing for "not being able to snap out of it."  In December 2017, Medel moved to Los Angeles to stay with a cousin.

In January 2018, Medel started working at a law firm in Los Angeles, her first job since being terminated from Oceanic.  Initially she earned $13 an hour working in the customer service department.  She was then promoted to work in the legal assistant department, earning $15 per hour until the job ended in May 2019.  She then drove for a ride-sharing company until March 2020, when the onset of the COVID-19 pandemic and quarantine rules brought her to live with her grandmother in Carpinteria, where she remained at the time of trial.

Medel experienced emotional distress while working for Oceanic, as well as after her termination up through the time of trial.  In January 2018, Medel began treatment with a therapist, whom she saw for about five sessions.  The sessions ended six months later in June 2018 because she did not have independent transportation and had just begun her new job at the law firm.

While employed at Oceanic, Medel was "really stressed out" because of its work environment, and because of "[t]he sexual assaults" she experienced. She felt "really anxious," had "panic attacks," and was "fearful" of her safety because of the "bad environment," which included in part prostitution and drug dealing that occurred at the hotel properties.  When she complained to

15

Chawla, he told her, "Those are our business. That is what sells in our industry." She felt stuck because she did not have anywhere to go. At one point, someone in the human resources department told her that if she were terminated, she would need to leave the premises and could no longer live at the hotel.

After her termination, Medel continued to feel "overwhelming stress." She was "filled with anxiety"; had insomnia, panic attacks, and trouble breathing; felt "embarrassed," "humiliated," and hopeless; "hated" herself; and suffered from a return of an eating disorder that she had managed since childhood.

At the time of trial, Medel felt she had made "significant progress" in her mental health, but believed the events during her employment and termination from Oceanic had "significantly" and permanently "changed" her as a person.

C.  *Fatme Fakhreddine*'s *Testimony*

Fakhreddine, another "young woman," worked at Oceanic Companies from February 2016 to May 2016. Like Medel, Briceno recruited Fakhreddine, her friend, to work for Oceanic Companies and offered her the job.

On her first day of work after orientation, Chawla, Chokshi, and Briceno invited Fakhreddine to lunch. But no one ate. Instead, Chawla, Chokshi and Briceno had drinks. Briceno and Chawla pressured Fakhreddine to drink with them but she declined. Chawla told Fakhreddine, "tomorrow is your first official day working for us, so I can still hit on you today." Chawla and Briceno then asked her to "go back to a hotel with them" because Briceno said "she was horny." Fakhreddine declined. When she told them she was tired and needed to go home to be ready to start work at

16

6:00 a.m. the next day, Chawla and Briceno offered to have cocaine available to "help" her through her first workday.

Fakhreddine estimated that while employed at Oceanic Companies, Chawla and Briceno asked her to go to Las Vegas about six or seven times, and Chokshi about five to six times. Fakhreddine rejected their invitations each time.

Six months before she started working with Oceanic Companies, Fakhreddine and her sister had gone to Las Vegas at Briceno's invitation. On the way to Las Vegas, Briceno had called someone she knew for cocaine. Once there, she and her sister were "sexually assaulted" by Chawla, Chokshi and Briceno. Chawla and Briceno told Fakhreddine and her sister they would have one room and they would "supposedly" get another room. But when they arrived, Chawla and Briceno said they could not get their own room and they wanted to stay in the same suite with Fakhreddine and her sister. Fakhreddine and her sister were "uncomfortable" with the "whole environment" because there were "drugs and a lot of alcohol"; they wanted to leave.

At some point, Fakhreddine got into bed, while her sister was in the bathroom. Chokshi got into her bed "behind [her]" and tried to touch her. Fakhreddine screamed and when she told Briceno what happened, Briceno told her not to worry and offered her cocaine. Briceno told Fakhreddine to snort "a line" of cocaine that was on Briceno's chest. Chawla wanted to watch Fakhreddine do it because it would excite him, and Chawla and Briceno both said "they were horny." Feeling really uncomfortable, Fakhreddine went to the bathroom where she found her sister on the floor. Her sister reported "they harassed her" and wanted to have a "threesome" with her. Both women

stayed in the bathroom until the morning when they could leave. The next morning, Chawla, Briceno, and Chokshi were rude to them.

The last time Chawla asked Fakhreddine to go to Las Vegas with him was the same day he fired her, in May 2016. Fakhreddine refused his invitation, telling him: "You know, you've been asking me to go to Vegas with you since I started, and I've always told you -- came up with excuses, told you no, . . . like with many excuses, because I don't want to go. And I don't want to lose my job. But I don't appreciate you asking me all the time to go to Vegas, and I don't think my new boyfriend will appreciate you asking me to go to Vegas." Chawla responded by asking her when she got a boyfriend.

That same day Fakhreddine began to receive "a lot of calls" from Briceno and learned Briceno had gone to the home of Fakhreddine's parents with Chawla and Chokshi looking for her. When Fakhreddine called Briceno upset about them visiting her parents' home, Briceno invited her for drinks but said, "No boyfriends allowed." Fakhreddine refused. Briceno called her back 15 minutes later and demanded Fakhreddine meet her at the El Cajon hotel. When Fakhreddine arrived, Chawla, Chokshi, and Briceno were there. Briceno took her aside and told her she was upset to learn Chawla and Chokshi were trying to take Fakhreddine to Las Vegas and "ask [her] out behind [Briceno's] back." When Fakhreddine returned to the group, Chawla accused her of giving out a "friends and family" code to her boyfriend without authorization. He then fired her.

In January 2018, Fakhreddine filed a civil complaint against Oceanic, Chawla, and others asserting 10 causes of action, including for discrimination on the basis of sex, sexual harassment, and retaliation in violation of the Fair Employment and Housing Act (Gov. Code, § 12900 et seq.) (FEHA).

18

Fakhreddine and Medel each testified they had met each other once through Briceno but are not friends and do not have each other's contact information.

D. *Briceno's Testimony*[9]

At the time of trial, Briceno was the vice president of Oceanic Companies. She began working for Oceanic Companies in 2014, and became the general manager of the La Jolla hotel in 2016. Although the Oceanic Companies' employee handbook prohibited drug and alcohol use on its properties, Briceno admitted using drugs and alcohol at the corporate office after work.

About the June 22, 2016 incident, Briceno remembered doing cocaine on a side table in Chawla's office with Chokshi and Medel, but could not recall if Chawla also did cocaine or whether he saw them using the drugs that night. Briceno also could not recall whether Chawla ever used cocaine in her presence, although she admitted it was possible. Briceno admitted using cocaine during the October 2015 Las Vegas trip with Medel.

Briceno denied ever having sexual intercourse with Chawla or being in a romantic relationship with him. She could not recall spending the night at Chawla's home when his wife was away; or getting into a hot tub naked with Chawla at his home; or going on a business trip to Laguna and meeting one of Chawla's business partners. On the night of June 22, 2016 (when Medel was sexually battered by Chokshi), Briceno claimed she drove herself home to the El Cajon hotel, she did not see anyone else, including Chokshi, at the property, and that she went to straight to sleep.

_____

[9] Although Briceno identified herself as Rubi Tetrault at the time she testified, we refer to her as Briceno for clarity.

E.     *Chawla's Testimony*

Chawla described Oceanic Companies as a "payroll entity," that also provided human resources support and accounting and marketing services to the individual hotels, which in turn reimbursed Oceanic Companies for those services.  Although every hotel had its own payroll, there was one centralized human resources department.

Oceanic Companies had an employee handbook that included an anti-harassment policy.  Included in that policy was a provision that stated, " 'Every report of perceived harassment will be fully investigated and corrective action will be taken where appropriate.' "  In the past Chawla had taken courses regarding harassment, including how to identify it; and if an employee complained about harassment, he or she would be directed to human resources who would prepare a written incident report.

Chawla confirmed his brother, Kushal, was assisting in the Oceanic business during a portion of Medel's employment with Oceanic.  Chawla did not believe Medel's complaints to Kushal that Chokshi was "after" her and causing others to give her writeups was a report of perceived harassment, claiming his brother was not "officially an employee or working for the company," but merely just helping out.

Chawla denied ever using cocaine including on the trip to Las Vegas in October 2015 with Chokshi, Briceno, and Medel, or on the night of June 22, 2016, during the party inside his corporate office.  He also denied having sex or being in a romantic relationship with Briceno, and denied returning with her to the El Cajon hotel in the early morning hours of June 22.

When first hired, Medel's employer was Oceanic El Cajon, LP.  She was subsequently transferred to Oceanic San Diego, and at one point also worked for Oceanic Marina, LP.  Each Oceanic hotel was owned by a separate limited

20

liability company. Chawla was the managing member of the various partnerships that owned the hotels; and was the signatory on the bank accounts for all such entities.

F.    *Chokshi's Testimony*

Chokshi began working for Oceanic Companies in 2011, left in 2013, and returned in 2014, where he worked as manager until October 2016, when he left the company for good.

He described two events involving Medel before she was hired by Oceanic. The first occurred in June or July 2015, when she accompanied him, Chawla, and Briceno on an overnight trip to Las Vegas. The second occurred in December 2015, when this same group traveled to Monterey, California.

Chokshi admitted using cocaine in Chawla's corporate office on the night of June 22, 2016; claimed Medel brought the drugs to the party; and denied Chawla was present when he used cocaine. Chokshi also denied going into Medel's room that night or sexually assaulting her while she slept. He claimed she dropped him off at the hotel, he "freshened up" in an auxiliary room next to the hotel lobby, and after a few hours took a taxi home.

G.    *Jennifer Gilbert*

Gilbert began working at Oceanic Companies in 2011. Since 2014, she has onboarded new employees, ensuring they were properly trained, and at some point became the company's director of human resources.

Oceanic Companies had anti-harassment, anti-retaliation, and anti-drug policies in place during Medel's employment. Gilbert recalled Kushal worked for Oceanic Companies for a short time, and if Medel had complained to him about harassment or retaliation, the matter should have been taken up by Chawla. It would have been "very surprising" and a "serious matter" if

Oceanic employees were using drugs or alcohol at the corporate office, including afterhours, as that would "cause a severe risk and threat to an employee's safety" and be an "extreme breach" of Oceanic Companies' policies.

## II.

### *The Jury's Verdicts*

Defendants agreed to use a general verdict form, in which the jury was asked to make special findings.[10]

As to Oceanic Companies and Oceanic San Diego, the jury found each liable on Medel's claims for (1) sexual harassment; (2) retaliation for opposing sex harassment; (3) failure to prevent harassment; (4) wrongful termination in violation of public policy; (5) intentional infliction of emotional distress; (6) negligent infliction of emotional distress; (7) negligent hiring, retention, and supervision; and (8) sexual battery. For these claims, the jury awarded Medel $1,386,360 against each defendant as follows: (i) $76,360 for past lost income; (ii) $60,000 for future lost income; (iii) $150,000 for past noneconomic loss; (iv) $100,000 for future noneconomic loss; and (v) $1 million in punitive damages.

As to Chawla, the jury found him liable to Medel's claims for (1) sexual harassment; (2) intentional infliction of emotional distress; and (3) negligent infliction of emotional distress. For these claims, the jury awarded Medel $2,386,360: (i) $76,360 for past lost income; (ii) $60,000 for future lost

---

10    Unlike a general verdict, courts cannot imply findings to support a special verdict. (*Singh v. Southland Stone, U.S.A., Inc.* (2010) 186 Cal.App.4th 338, 358 (*Singh*) ["With a special verdict, unlike a general verdict or a general verdict with special findings, a reviewing court will not infer findings to support the verdict."].)

income; (iii) $150,000 for past noneconomic loss; (iv) $100,000 for future noneconomic loss; and (v) $2 million in punitive damages.

As to Chokshi, the jury found him liable to Medel for (1) sexual harassment; (2) intentional infliction of emotional distress; (3) negligent infliction of emotional distress; and (4) sexual battery. As to these claims, the jury awarded Medel $1,268,180: (i) $38,180 for past lost income; (ii) $30,000 for future lost income; (iii) $250,000 for past noneconomic loss; (iv) $200,000 for future noneconomic loss; and (v) $750,000 in punitive damages.

The court entered judgment for Medel in early July 2021.

### III.

*JNOV/New Trial Motions*

In late July 2021, defendants moved for JNOV and/or a new trial. Defendants argued in their motion for JNOV that the evidence was insufficient to support the awards for past and future lost income and punitive damages. In their new trial motion, defendants asserted myriad grounds to support relief, including damages are excessive (§ 657, subd. (5)), the evidence was insufficient to justify the verdict and the verdict is against the law (*id.*, subd. (6)).

In an August 27, 2021 minute order, the trial court denied defendants' JNOV motion, ruling there was sufficient evidence to support the jury's verdicts. Defendants have not appealed this ruling. However, the court granted their new trial motion as to damages, conditioned on Medel's agreement to remittitur of the amount of future lost income and punitive damages.

The trial court eliminated the jury's award of $60,000 in future lost income as against Oceanic Companies, Oceanic San Diego, and Chawla, and $30,000 as against Chokshi, stating: "The future lost income awards against

23

each [d]efendant are excessive in that the awards are not supported by a rational foundation in the evidence. Each of those awards are [*sic*] remitted to zero damages."

As for punitive damages, the trial court found the reprehensibility of each defendant's conduct, "though not to be condoned," was "not so severe that [Medel], with knowledge of [d]efendant's unusual co-mingling of personal and business practices, was deterred from accepting employment" with defendants; and "[f]urther, after her employment began, [Medel], by her own acknowledgment, participated in many of the same practices she criticized at trial."

The trial court also found the ratio of punitive to compensatory damages unreasonable as to each defendant. As to Chawla's financial condition, the court found he had a net worth of about $7 million before the COVID-19 pandemic, but credited his testimony that, since the pandemic, his net worth had "diminished significantly." Regarding Oceanic Companies, Oceanic San Diego, and Chokshi, the court found "[t]here was little, if any, evidence" of their financial condition "to support the size of the punitive damages awards."

As a result, the trial court reduced the punitive damages awards against Oceanic Companies and Oceanic San Diego from $1 million to $326,360, representing a one-to-one ratio between punitive and compensatory damages. As to Chawla, the court's tentative was to reduce the $2 million punitive damages award also to a one-to-one ratio of $326,360. However, after taking the matter under submission and upon further reflection, the court remitted the punitive damages award against Chawla to $652,720, representing a two-to-one ratio of punitive to compensatory damages. As to Chokshi, the court remitted the punitive damages award of $750,000 to

24

$1,000, which, as we mentioned, is not at issue in the appeal. (See fn. 2, a*nte.*)

On September 13, 2021, Medel timely filed her notice of election and accepted remittitur. The trial court entered the amended judgement on September 20, from which the parties have appealed.

DISCUSSION

I.

*General Principles on Motion for New Trial*

Section 657 provides that a jury verdict "may be vacated . . . in whole or in part, and a trial or further trial granted on all or part of the issues, on the application of the party aggrieved" based on any of the causes enumerated in the statute "materially affecting the substantial rights of such party[.]" (§ 657.) As relevant here, these causes include "[e]xcessive or inadequate damages" (§ 657, subd. (5)) and "[i]nsufficiency of the evidence to justify the verdict or other decision, or the verdict or other decision is against law" (*id.*, subd. (6)). A court may grant a new trial due to excessive damages or insufficiency of the evidence only if it "is convinced from the entire record, including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision." (§ 657.)

Section 662.5, subdivision (a)(2), provides that when the ground for granting a new trial is excessive damages, the trial court may in its discretion "issue a conditional order granting the new trial unless the party in whose favor the verdict has been rendered consents to the reduction of so much thereof as the court in its independent judgment determines from the evidence to be fair and reasonable."

When a motion for new trial is granted on the ground of excessive damages, or when, as here, the trial court requires a reduction in the amount

25

of damages as a condition of denying the motion, the order will not be reversed unless it plainly appears the court has abused its discretion.  (*Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 932–933 (*Neal*).)  And "when there is a material conflict of evidence regarding the extent of damage[,] the imputation of such abuse is repelled, the same as if the ground of the order were insufficiency of the evidence to justify the verdict.' " (*Ibid.*)  "The reason for this is that the trial court, in ruling on the motion, sits not in an appellate capacity but as an independent trier of fact." (*Ibid.*)  Thus, a "trial court's determination [in ruling on a new trial motion] of whether damages were excessive 'is entitled to great weight' because it is bound by the 'more demanding test of weighing conflicting evidence than our standard of review under the substantial evidence rule.' " (*Fortman v. Hemco, Inc.* (1989) 211 Cal.App.3d 241, 259 (*Fortman*).)

"The mere fact that the judgment is large does not validate an appellant's claim that the verdict is the result of passion or prejudice of the jury. . . .  'It is only in a case where the amount of the award of general damages is so disproportionate to the injuries suffered that the result reached may be said to shock the conscience, that an appellate court will step in and reverse a judgment because of greatly excessive . . . general damages.' [Citation.]  That result which requires reversal should clearly appear from the record." (*DiRosario v. Havens* (1987) 196 Cal.App.3d 1224, 1241 (*DiRosario*).)  In reviewing a trial court's exercise of discretion under section 662.5, subdivision (a)(2), all presumptions favor the court's determination, and we review the record in the light most favorable to the judgment. (*Fortman*, *supra*, 211 Cal.App.3d at p. 259, citing *Neal*, *supra*, 21 Cal.3d at p. 927.)

## II.

## *Past Lost Income*

A.    *Background*

The trial court instructed the jury as follows with a modified version of CACI No. 3903C: "The following are the specific items of economic damages claimed by Plaintiff Rut Medel: [¶] 1) Past Lost Earnings. To recover damages for past lost earnings, Plaintiff must prove the amount of income she has lost to date. [¶] 2) Future Lost Earnings. To recover damages for future lost earnings, Plaintiff must prove the amount of income she will be reasonably certain to lose in the future as a result of the injury."

The trial court also gave CACI No. 3903P, which provides in part: "If you find that Defendant Oceanic Companies, Inc., discharged Plaintiff Rut Medel for opposing sexual harassment in the workplace, then you must decide the amount of past and future lost earnings that Plaintiff has proven she is entitled to recover, if any. To make that decision, you must: [¶] 1. Decide the amount that Plaintiff would have earned up to today, including any benefits and pay increases; and [¶] 2. Add the present cash value of any future wages and benefits that Plaintiff would have earned for the length of time the employment with Defendant was reasonably certain to continue. [¶] In determining the period that Plaintiff's employment was reasonably certain to have continued, you should consider such things as: [¶] 1. Plaintiff's age, work performance and intent regarding continuing employment with Defendant; [¶] 2. Defendant's prospects for continuing the operations involving Plaintiff; [¶ and] 3. Any other factors that bear[ ] on how long Plaintiff would have continued to work."

During closing argument, Medel's counsel explained to the jury that Medel made about $13.50 per hour and averaged $540 a week while working

27

at Oceanic, which would have resulted in earnings of about $28,000 a year; and suggested the jury award her three years of earnings or $84,000 for past lost income. Counsel noted Medel had mitigated her damages from January 2018 to April 2019, but argued she was still entitled to be compensated up to the time of trial.

B. *Analysis*

As used in employment litigation, backpay means "lost-wages damages through the time of trial." (*Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 388 (*Horsford*); accord, *Davis v. Los Angeles Unified School Dist. Personnel Com.* (2007) 152 Cal.App.4th 1122, 1133 (*Davis*) ["Backpay serves to make an employee whole for the employer's wrongdoing."].) The jury therefore was properly instructed that it could award Medel past lost income from February 2017, when she was terminated, through the time of trial in June 2021. (See CACI Nos. 3903C, 3903P.)

The jury's separate damages awards of $76,360 against Oceanic Companies, Oceanic San Diego, and Chawla for past lost income was roughly equivalent to the three years of salary she would have earned at Oceanic if she had remained employed (i.e., about $28,000 a year), and slightly less than the figure suggested by her counsel during closing argument. The jury's award of $38,180 as to Chokshi, slightly more than one year of Medel's Oceanic salary, was reasonable given the evidence that Chokshi's employment with Oceanic Companies ended in October 2016, about four months *before* Medel's termination.[11]

___

[11] For this reason, we reject defendants' argument that the jury verdicts were "irreconcilable" because the jury awarded different amounts for lost past (and future) income as to Oceanic Companies, Oceanic San Diego, and

Viewing the record in the light most favorable to the judgment (*Fortman*, *supra*, 211 Cal.App.3d at p. 259) and giving the trial court's determination " 'great weight' " (*ibid.*), we conclude the jury's damages awards for lost past income do not " 'shock the conscience' " (*DiRosario*, *supra*, 196 Cal.App.3d at p. 1241) and are supported by substantial evidence (see *Burchell v. Faculty Physicians & Surgeons etc.* (2020) 54 Cal.App.5th 515, 527 (*Burchell*) [noting " '[t]he duty of an appellate court is to uphold the jury and trial judge whenever possible[,]' " and thus review of a " 'jury's damages award [is] for substantial evidence, giving due deference to the jury's verdict and the trial court's denial of the new trial motion' "]). We therefore conclude the trial court did not abuse its broad discretion when it denied this part of defendants' new trial motion. (*Neal*, *supra*, 21 Cal.3d at p. 933; *Fortman*, *supra*, 211 Cal.App.3d at p. 259.)

Defendants on appeal nonetheless contend the evidence is insufficient to support this economic loss award because Medel mitigated her damages when she obtained comparable employment in January 2018, about 10 months after she was terminated by Oceanic. By their math,[12] they contend she is entitled to no more than $21,600 in past lost income.

---

Chawla, on the one hand, and Chokshi on the other. In addition, we reject this argument because the parties did not use a "special verdict," as defendants contend, but instead a general verdict with special findings. (*Singh*, *supra*, 186 Cal.App.4th at p. 358.) Thus, we find inapplicable the rule cited by defendants that, when " 'there is an inconsistency between or among answers within a *special verdict*, both or all the questions are equally against the law." (Italics added.)

[12] Assuming Medel worked at Oceanic earning $13.50 an hour over a 40-hour work week, or $540 per week, according to defendants she would only be entitled to $21,600 for past lost income (i.e., 10 months or 40 weeks earning $540 per week until she acquired new employment).

The right to recover damages in civil actions is qualified by the common law doctrine of avoidable consequences, also referred to as mitigation of damages. Under this doctrine, "a person injured by another's wrongful conduct will not be compensated for damages that the injured person could have avoided by reasonable effort or expenditure." (*State Dept. of Health Services v. Superior Court (McGinnis)* (2003) 31 Cal.4th 1026, 1043.) If applicable, the amount the employee reasonably would have earned in the terminated employment is reduced by the amount of the plaintiff's actual earnings during the same time period or by the amount the plaintiff could have earned through reasonable diligence in obtaining comparable employment. (*Davis*, *supra*, 152 Cal.App.4th at p. 1134.) The employer bears the burden of proving the former employee's failure to mitigate his or her damages. (*Currieri v. City of Roseville* (1975) 50 Cal.App.3d 499, 506 (*Currieri*).) Whether the employer met this burden is a question of fact subject to review for substantial evidence. (*Powerhouse Motorsports Group, Inc. v. Yamaha Motor Corp., USA* (2013) 221 Cal.App.4th 867, 884.)

Here, other than the hourly rate Medel earned in her new employment and the dates she began and ended such employment, defendants offered no evidence to show what she *actually* earned in mitigation of her past lost earnings.[13] Because it was defendants' burden to make this showing and

---

[13]    At oral argument, counsel for defendants asserted there was testimony from Medel that she worked 40 hours a week or full time at the law firm job she obtained after Oceanic terminated her. We have been unable to locate any such testimony in the record. We also note nowhere in their briefing on appeal do defendants assert that Medel worked 40 hours a week at the law firm job, much less provide a record citation to support counsel's assertion at argument.

because they failed to proffer *evidence*[14] in support of such a showing (*Currieri, supra*, 50 Cal.App.3d at p. 506), we reject their contention that the trial court erred in denying this portion of their new trial motion.

III.

*Future Lost Income*[15]

A.   *Background*

Front pay "is a measure of damages for loss of future income[.]" (*Horsford, supra*, 132 Cal.App.4th at p. 388.)  The jury awarded Medel $60,000 in future lost income as against Oceanic Companies, Oceanic San Diego, and Chawla, and $30,000 as against Chokshi.  In granting defendants' new trial motion and reducing this damage item to zero as to each defendant, the trial court stated:  "The future lost income awards against each Defendant are *excessive* in that the awards are not supported by a *rational*

---

[14]   In their new trial motion and on appeal, defendants contend that Medel's own counsel acknowledged during closing argument that his client mitigated her damages by accepting new employment comparable to her job at Oceanic.  But counsel's argument is not evidence, as the trial court properly instructed the jury.  (CACI No. 3925 ["The arguments of the attorneys are not evidence of damages.  Your award must be based on your reasoned judgment applied to the testimony of the witnesses and the other evidence that has been admitted during trial."]; accord, *Beagle v. Vasold* (1966) 65 Cal.2d 166, 180–181 (*Beagle*) [recognizing a "trial court can and should instruct the jury that the argument of counsel as to the amount of damages claimed by the plaintiff is not evidence and that its duty is only to award such damages as will reasonably compensate the plaintiff" for his or her injuries].)

[15]   Although Medel raised the issue of future lost income in her cross-appeal, we address it here, before our discussion of the punitive damages awards, because analysis of the punitive damages depends in part on the amount of all of her compensatory damages.

31

*foundation in the evidence.* Each of those awards are [*sic*] remitted to zero damages." (Italics added.)

B.    *Analysis*

1.    *Insufficiency of the Evidence/Excessive Damages*

Medel contends the award for future lost income must be reinstated because the trial court failed to comply with section 657, which provides in relevant part: "When a new trial is granted, on all or part of the issues, the court shall specify the ground or grounds upon which it is granted *and the court's reason or reasons* for granting the new trial upon each ground stated. [¶] . . . [¶] [O]n appeal from an order granting a new trial upon the ground of the insufficiency of the evidence to justify the verdict or other decision, or upon the ground of excessive or inadequate damages, it shall be conclusively presumed that said order as to such ground was made only for the reasons specified in said order or said specification of reasons[.]" (§ 657, italics added.) Medel argues the court's reason in remitting this item of damage to zero was insufficient, as it did not refer to the evidence but instead relied on the "ultimate fact that the award [was] excessive."

Our Supreme Court has observed that " '[n]o hard and fast rule can be laid down as to the content of . . . a specification [of reasons under section 657], and it will necessarily vary according to the facts and circumstances of each case.' " (*Stevens v. Parke, Davis & Co.* (1973) 9 Cal.3d 51, 60 (*Stevens*).) But the Court has emphasized "that if the ground relied upon is 'insufficiency of evidence,' the trial judge's specification of reasons 'must briefly identify the portion of the record which convinces the judge "that the court or jury clearly should have reached a different verdict or decision." ' " (*Ibid.*) And it has applied the same rules that govern the specification of reasons on the ground of insufficiency of the evidence to a specification of

reasons on the ground of excessive damages, recognizing that "to state that the damages awarded by the jury are excessive is simply one way of saying that the evidence does not justify the amount of the award." (*Id.* at p. 61.)

Here, it appears the trial court conflated subparts (5) and (6) of section 657, as it ostensibly relied on both prongs to support remitting these damages to zero without explaining the reason or reasons for its decision under either prong. This is similar to the facts in *Stevens*, where our Supreme Court reinstated the jury's award of $400,000, after the trial court had remitted it to about $65,000. (*Stevens*, *supra*, 9 Cal.3d at pp. 59–60.) In doing so, the *Stevens* court reasoned: "[W]e note that the new trial order makes no pretense of specifying reasons upon which the judge based his decision to grant defendants' motions. The statement that the '*verdict is excessive, that it is not sustained by the evidence*' is, as in [other cases], a statement of ultimate fact that does not go beyond a statement of the ground for the court's decision. It does not indicate the respects in which the evidence dictated a less sizable verdict, and fails even to hint at any portion of the record that would tend to support the judge's ruling. Certainly the statement that the amount of the verdict was 'based upon prejudice and passion on the part of the jury' is not a 'reason' that provides an insight into the record." (*Id.* at p. 62, emphasis added.)

Medel relies on *King v. U.S. Bank National Assn.* (2020) 53 Cal.App.5th 675 (*King*) to support reinstatement of the jury's future lost incomes awards. In *King*, the jury awarded the plaintiff $1 million for shame, mortification, and hurt feelings arising from the defendant's defamation. (*Id.* at p. 721.) In conditionally granting the defendant's new trial motion and remitting the award to $25,000, the trial court stated: " "The [c]ourt, in its independent judgment and in consideration of the entire record, finds that the evidence

33

does not clearly support the emotional distress damages award and the award is excessive. The [c]ourt has determined that reducing such emotional distress damages based on defamation [from $1 million] to $25,000 would be fair and reasonable based on the evidence at trial.' " (*Id.* at p. 722.) The plaintiff argued the court's stated reasons were insufficient under section 657. The Court of Appeal agreed.

In reaching its decision, the *King* court noted the trial court's order "must 'refer to evidence, not ultimate facts' " (*King, supra,* 53 Cal.App.5th at p. 722, quoting *Oakland Raiders v. National Football League* (2007) 41 Cal.4th 624, 635); that the trial court's statement did not " 'indicate the respects in which the evidence dictated a less sizeable verdict and fail[ed] even to hint at any portion of the record that would tend to support the judge's ruling' " (*King,* at p. 722, quoting *Stevens, supra,* 9 Cal.3d at p. 62); and that the trial court's statement did "not go beyond the ground for the court's decision" (*ibid.*, citing *Stevens,* at p. 62). The *King* court thus reversed the new trial order and reinstated the jury's award of $1 million for emotional distress damages. (*King,* at p. 722.) We find *King*'s reasoning persuasive in the case before us.

Defendants, however, argue that *King* is distinguishable because here the trial court's reason for remitting the future lost income to zero was "that *nothing* in the record" supported that award. Defendants argue there was no evidence on which the trial court could rely to support the future lost income awards, and that because such evidence was "lacking altogether," there was no need for the trial judge to include record cites in its new trial order. We are not persuaded.

The trial judge's statement that the future lost income awards were "excessive" and "not supported by a *rational foundation* in the evidence"

34

(italics added) does not compel a conclusion the court meant that Medel submitted *no evidence* to support the awards. That conclusion would require us to speculate as to the *reasons* for the trial judge's elimination of these awards, which is exactly why section 657 requires a clear statement in support of the judge's ruling that the jury should have reached a different verdict or decision. (*Stevens*, *supra*, 9 Cal.3d at p. 60; accord, *Mercer v. Perez* (1968) 68 Cal.2d 104, 115 [explaining that the purpose of the specification of reasons in section 657 is to "promote judicial deliberation before judicial action, and thereby 'discourage hasty or ill-considered orders for new trial,'" and that, while "[n]o hard and fast rule can be laid down as to the content of such a specification," a trial judge granting a new trial must furnish a "clear statement of [such] reasons"].) We conclude no statement of reason or reasons exists in the instant case, much less a "*clear* statement of [such] reasons." (*Mercer*, at p. 115, italics added.)

What's more, there was evidence to support the jury's future lost income awards. In January 2017, Chawla went to Medel and Briceno's apartment, sat on their bed, and asked both women to sit next to him. While hugging both women, he told them, "'You know I love you two. You guys are my best girls. . . . I want you guys to represent me and my companies. I want you to be overseeing my company sites, eventually one day.'" At the time of trial in June 2021, Briceno had been promoted to vice president of Oceanic Companies, "overseeing" Chawla's Oceanic business. This evidence supports the inference that, were it not for Chawla's sexual advances, Medel too would have remained employed by Oceanic and become an executive "overseeing" his Oceanic enterprise, rather than being terminated a little more than a month after she *again* refused Chawla's sexual advances.

Relying on *Stevens* as binding authority and *King* as persuasive authority, we conclude the trial judge's reliance on both subparts (5) and (6) of section 657 as *grounds* to support remittitur, devoid of the *reasons* for such grounds other than remitting them to zero, means this portion of the new trial order cannot stand. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 ["Under the doctrine of *stare decisis*, all tribunals exercising inferior jurisdiction are required to follow decisions of courts exercising superior jurisdiction."].) We therefore reverse this portion of the new trial order and reinstate the jury's separate awards of $60,000 for lost future income as to Oceanic Companies, Oceanic San Diego, and Chawla, and $30,000 as to Chokshi.

2.      *Against the Law*

In their respondents brief to Medel's cross-appeal, defendants also argue the trial court's new trial order remitting the future lost income awards to zero was justified because the jury's award was "against [the] law," as they contend the evidence presented by Medel to support these awards was "speculative."

" '[W]here the ground under consideration is that the original judgment order is "against the law," the area of judicial action generally is not one involving discretion. The initial choice of the trial court challenged by a motion on this ground was either right or wrong, and this is the nature of the evaluation which must be made in passing upon a motion for a new trial where "against the law" is the ground. Stated otherwise, a decision is "against the law" where the evidence is insufficient in law and without conflict on any material point.' " (*Hoffman-Haag v. Transamerica Ins. Co.* (1991) 1 Cal.App.4th 10, 15 (*Hoffman-Haag*).)

36

The issue in *Hoffman-Haag*, on which defendants rely, involved the question of whether a party could present a new theory in a motion for new trial when that theory merely involved a question of law on undisputed facts. (*Hoffman-Haag, supra*, 1 Cal.App.4th at p. 15 [whether the insurance code precluded the plaintiffs' recovery as a matter of law].)  Here, the issue of the amount of economic damages " 'is a fact question, first committed to the discretion of the jury and next to the discretion of the trial judge on a motion for new trial.' " (*Burchell, supra*, 54 Cal.App.5th at p. 527.)

In light of this record, in which the evidence showed Chawla actively recruited Medel to move to San Diego and take a job in his Oceanic enterprise; repeatedly attempted to engage her in sexual acts while making a promise she someday would become an executive in his company like Briceno; and retaliated against Medel and ultimately terminated her within about a month after she again refused his sexual advances, we conclude the future lost income awards were not unsupported by substantial evidence, as a matter of law.  (*Fergus v. Songer* (2007) 150 Cal.App.4th 552, 567 [" 'The jury's verdict was "against [the] law" only if it was "unsupported by any substantial evidence, i.e., [if] the entire evidence [was] such as would justify a directed verdict against the part[ies] in whose favor the verdict [was] returned." ' "]; accord *Hoffman-Haag, supra*, 1 Cal.App.4th at p. 15.)

## IV.

### *Noneconomic Loss*

Defendants next argue the trial court erred in denying their new trial motion when it refused to remit the jury's noneconomic damage awards.

A.    *Background*

The trial court instructed the jury, in part, with a modified version of CACI No. 3905A, which set forth the following specific items of noneconomic

37

damages claimed by Medel: "Past and future pain and suffering, stress, anxiety, panic attacks, loss of sleep, depression, insomnia and humiliation." This instruction also provided: "No fixed standard exists for deciding the amount of these damages. You must use your judgment to decide a reasonable amount based on the evidence and your common sense. [¶] To recover for future mental suffering, anxiety, humiliation, emotional distress, anxiety and depression, Plaintiff must prove that she is reasonably certain to suffer that harm."

During closing argument, Medel's counsel asked the jury to award her $250,000 in noneconomic damages against each defendant based on their "vile" and "reprehensible" conduct. The jury's verdicts separately awarded Medel $150,000 and $100,000 for past and future noneconomic damages, respectively, against Oceanic Companies, Oceanic San Diego, and Chawla; and $250,000 and $200,000 for past and future noneconomic damages, respectively, against Chokshi.

B.    *Guiding Principles*

Noneconomic damages compensate an injured plaintiff for nonpecuniary injuries, including pain and suffering, emotional distress, invasion of a person's bodily integrity (i.e., the fact of the injury itself), disability, impaired enjoyment of life, and susceptibility to future harm or injury. (*Phipps v. Copeland Corporation LLC* (2021) 64 Cal.App.5th 319, 337–338 (*Phipps*); accord, *Corenbaum v. Lampkin* (2013) 215 Cal.App.4th 1308, 1332 (*Corenbaum*) ["Pain and suffering is a unitary concept that encompasses physical pain and various forms of mental anguish and emotional distress."].) "Such injuries are subjective, and the determination of the amount of damages by the trier of fact is equally subjective. [Citation.]

38

There is no fixed standard to determine the amount of noneconomic damages." (*Corenbaum*, at p. 1332, fn. omitted.)

As our Supreme Court has explained: "One of the most difficult tasks imposed upon a jury in deciding a case involving personal injuries is to determine the amount of money the plaintiff is to be awarded as compensation for pain and suffering. No method is available to the jury by which it can objectively evaluate such damages, and no witness may express his [or her] subjective opinion on the matter. [Citation.] In a very real sense, the jury is asked to evaluate in terms of money a detriment for which monetary compensation cannot be ascertained with any demonstrable accuracy. . . . 'Translating pain and anguish into dollars can, at best, be only an arbitrary allowance, and not a process of measurement, and consequently the judge can, in his [or her] instructions, give the jury no standard to go by; [the judge] can only tell them to allow such amount as in their discretion they may consider reasonable . . . . The chief reliance for reaching reasonable results in attempting to value suffering in terms of money must be the restraint and common sense of the jury.' " (*Beagle*, *supra*, 65 Cal.2d at p. 172; accord, *Corenbaum*, *supra*, 215 Cal.App.4th at pp. 1332–1333 ["There is no fixed standard to determine the amount of noneconomic damages. Instead, the determination is committed to the discretion of the trier of fact."].)

Thus our review of a jury's determination of noneconomic damages is " ' "very narrow." ' " (*Phipps*, *supra*, 64 Cal.App.5th at p. 343; accord, *Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 614 (*Rufo*).) "The power of the appellate court differs materially from that of the trial court in passing on this question." (*Seffert v. Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 507 (*Seffert*)). We therefore "will not disturb the trial court's ruling on a motion for new trial unless the record reveals a manifest and unmistakable abuse of

39

discretion." (*Soto v. BorgWarner Morse TEC Inc.* (2015) 239 Cal.App.4th 165, 200 (*Soto*).)

C.    *Analysis*

Defendants argue the jury's awards of noneconomic damages are excessive for a host of reasons, including for example: (1) Medel knew about the work environment she was entering into and continued to "party/dance/participate in drugs" and "socially interact with" Chawla, Chokshi, and Briceno after the incidents she complained about; (2) "there was no sexual intercourse" with Medel; (3) Medel failed to mention any of "the incidents" in her personal diary or discussed them with Briceno; and (4) Medel had "less distress since termination" and "had made significant progress to 'being okay.' "

We reject defendants' excessiveness arguments as nothing more than an improper invitation for us to reweigh the evidence, reevaluate the credibility of the witnesses, and make new findings more favorable to them. (See *Mathews v. Happy Valley Conference Center, Inc.* (2019) 43 Cal.App.5th 236, 251 [recognizing the general rule that when findings of fact are challenged on appeal, a reviewing court does not "reweigh the evidence or judge the credibility of witnesses," but instead determines whether there is any substantial evidence, contradicted or uncontradicted, to support the findings below].)

As we already have discussed, substantial evidence in the record shows that Medel endured multiple incidents of sexual harassment and sexual advances by Chawla; that Chokshi sexually battered her; and that Oceanic failed to investigate and put a stop to such misconduct, despite having anti-harassment and anti-retaliation policies. There is also substantial evidence that Medel suffered severe emotional distress from defendants' misconduct

40

during her employment and after her termination, including up through the time of trial. She experienced anxiety, insomnia, panic attacks, and trouble breathing, embarrassment, humiliation, hopelessness, and a return of her childhood eating disorder because of defendants' misconduct. And although Medel was making "significant progress" in her mental health, defendants ignore her testimony that their misconduct left her significantly and permanently changed as a person.

Resolving all presumptions in favor of the decisions of the jury and the trial court in ruling on the new trial motion (*Phipps*, *supra*, 64 Cal.App.5th at p. 338), we conclude there is ample evidence to support the jury's noneconomic damages awards against each defendant (see *Capelouto v. Kaiser Foundation Hospitals* (1972) 7 Cal.3d 889, 892–893, fn. omitted ["In general, courts have not attempted to draw distinctions between the elements of 'pain' on the one hand, and 'suffering' on the other; rather, the unitary concept of 'pain and suffering' has served as a convenient label under which a plaintiff may recover not only for physical pain but for fright, nervousness, grief, anxiety, worry, mortification, shock, humiliation, indignity, embarrassment, apprehension, terror or ordeal."]).

Defendants rely on *Briley v. City of West Covina* (2021) 66 Cal.App.5th 119 (*Briley*) to support their contention the noneconomic damages awards are excessive. In *Briley*, the jury awarded the plaintiff, a deputy fire marshal, $500,000 in economic damages, $2 million in past noneconomic damages, and $1.5 million in future noneconomic damages, after the plaintiff claimed he had been terminated in retaliation for *his complaints of fire code violations* and other misconduct within the department. (*Id.* at p. 123.) Unlike Medel, the plaintiff in *Briley* experienced no mental health issues, and made vague complaints about how his termination had caused him " 'distress,' " was

41

" 'tough,' " " 'upsetting,' " and " 'just difficult,' " leading to " 'issues with [his] sleep' because of the financial uncertainty he was experiencing at the time." (*Id.* at p. 139.)

In vacating the trial court's order denying the city's new trial motion, the Court of Appeal in *Briley* concluded the combined *$3.5 million noneconomic award* was "shockingly disproportionate to the evidence" of the plaintiff's harm (*Briley, supra,* 66 Cal.App.5th at p. 141), particularly given the lack of any evidence that "the problems Briley described was particularly severe" (*id.* at p. 142). "[W]ithout evidence of significant, concrete harm," the Court of Appeal reasoned the "typical posttermination difficulties" the plaintiff experienced could not support such an award. (*Ibid.*) It therefore conditionally remanded the case for retrial on these issues, unless the plaintiff accepted a reduction of the noneconomic awards for past and future loss to $1 million and $100,000, respectively. (*Id.* at p. 124.)

This case is not *Briley*. The jury found Medel was the victim of sexual battery, unwanted sexual touching, and unwanted sexual advances; and that she was retaliated against then terminated for rebuffing and/or reporting sexual misconduct. The jury also believed Medel suffered severe distress as a result. Unlike *Briley*, there is substantial evidence here of both "significant" and "concrete harm" to Medel. (*Briley, supra,* 66 Cal.App.5th at p. 142.) Contrary to defendants' argument that *Briley* "provides a nice compass to reduce [Medel's] noneconomic damages to palatable limits," the factual differences between the two cases support the jury's comparatively more modest awards of noneconomic damages for Medel, and the trial court's post-judgment order refusing to reduce those awards.

In their briefing on appeal, defendants argue the jury's award of noneconomic damages, as well as punitive damages, was excessive because

42

Medel "never was raped" and "was not a victim of sexual intercourse."  We find this particular argument singularly unpersuasive.  Not only is their theory utterly lacking in legal support, but it is also sorely misguided.  In essence, defendants' claim is not that they caused Medel minimal harm, but that they could have harmed her more.  We fail to see how this logic negatives the anguish Medel did suffer, or how it supports reversal of the jury's valuation of her noneconomic damages.

Defendants also argue the combined $450,000 award against Chokshi cannot stand because it was $200,000 more than the separate awards against Oceanic Companies, Oceanic San Diego, and Chawla.  However, unlike Chawla, the jury found Chokshi sexually battered Medel.  This finding supports the inference the jury found Chokshi's conduct more egregious than Chawla's, and awarded damages accordingly.[16]  (See Civ. Code, § 1708.5, subd. (a) ["A person commits a sexual battery who does any of the following: [¶] (1) Acts with the intent to cause a harmful or offensive contact with an intimate part of another, and a sexually offensive contact with that person directly or indirectly results."]; accord, *Angie M. v. Superior Court* (1995) 37 Cal.App.4th 1217, 1225 ["A cause of action for sexual battery . . . requires the batterer intend to cause a 'harmful or offensive' contact and the batteree suffer a 'sexually offensive contact.' "].)

In sum, it initially was up to the jury to weigh the evidence and assess Medel's noneconomic losses, and subsequently to the trial court to do the same in ruling on defendants' new trial motion.  As our Supreme Court stated in *Seffert*:  "It must be remembered that the jury fixed these damages, and that the trial judge denied a motion for new trial . . . .  These

---

16  See footnote 11, *ante*.

43

determinations are entitled to great weight. . . .  [A]ll presumptions are in favor of the decision of the trial court [citation].  The power of the appellate court differs materially from that of the trial court in passing on this question.  An appellate court can interfere on the ground that the judgment is excessive only on the ground that the verdict is so large that, at first blush, it shocks the conscience and suggests, passion, prejudice or corruption on the party of the jury." (*Seffert*, *supra*, 56 Cal.2d at pp. 506–507.)  No such grounds exist here.

## V.

### *Punitive Damages*

Defendants contend the trial court erred when it failed to further reduce and/or eliminate the jury's punitive damages awards against Chawla, Oceanic Companies, and Oceanic San Diego.

A.    *Background*

The jury awarded Medel $2 million in punitive damages against Chawla and $1 million each against Oceanic Companies and Oceanic San Diego.  In its August 27, 2021 minute order, the trial court found these punitive damage awards were "excessive," ruling:  (1) the reprehensibility of defendants' conduct "was not so severe" that it prevented Medel from taking the job with Oceanic in the first place and because, in its view, Medel "participated in many of the same practices she criticized at trial"; (2) the ratio of punitive damages to compensatory damages was unreasonable; and (3) the evidence of their financial condition did not support the amount of the awards.

The trial court tentatively remitted the punitive damages awards as to Chawla, Oceanic Companies, and Oceanic San Diego to $326,360 — a ratio of what was then one-to-one to the compensatory damages awarded against

44

each defendant.  However, in its September 1, 2021 minute order, while confirming the remitted punitive damage awards against Oceanic Companies and Oceanic San Diego, the court, upon further reflection, settled on a two-to-one ratio of punitive to compensatory damages as to Chawla, remitting the jury's $2 million award to $652,720 against him.

B.    *Guiding Principles*

California law permits awards of punitive damages "for the sake of example and by way of punishing the defendant."  (Civ. Code, § 3294, subd. (a).)  "In a civil case not arising from the breach of a contractual obligation, the jury may award punitive damages 'where it is proven by clear and convincing evidence that the defendant has been guilty of oppression,[17] fraud, or malice."[18]  (*Roby*, *supra*, 47 Cal.4th at p. 712.)

"In our judicial system, '[a]lthough compensatory damages and punitive damages are typically awarded at the same time by the same decisionmaker, they serve distinct purposes.  The former are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct.  [Citations.]  The latter . . . operate as "private fines" intended to punish the defendant and to deter future wrongdoing.' "  (*Nickerson v. Stonebridge Life Ins. Co.* (2016) 63 Cal.4th 363, 371 (*Nickerson I*); see *State Farm Mut. Automobile Ins. Co. v. Campbell* (2003) 538 U.S. 408, 416 (*State*

---

[17]    "Oppression" is defined as "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." (Civ. Code, § 3294, subd. (c)(2).)

[18]    "Malice" is defined as "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others."  (Civ. Code, § 3294, subd. (c)(1).)

*Farm*) [punitive damages serve a "broader function" than compensatory damages, as "they are aimed at deterrence and retribution"]; *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.* (2001) 532 U.S. 424, 432 (*Cooper Industries*) [punitive damages are " 'quasi-criminal' " and designed to "operate as 'private fines' intended to punish the defendant and to deter future wrongdoing"].)

"States necessarily have considerable flexibility in determining the level of punitive damages that they will allow in different classes of cases and in any particular case." (*BMW of North America, Inc. v. Gore* (1996) 517 U.S. 559, 568 (*Gore*).) However, "[t]he due process clause of the Fourteenth Amendment . . . places constraints on state court awards of punitive damages." (*Roby*, *supra*, 47 Cal.4th at p. 712; citing *State Farm*, *supra*, 538 U.S. at pp. 416–418 and *Gore*, at p. 568.) In particular, due process prohibits the imposition of grossly excessive or arbitrary punitive damages awards, for due process " 'entitles a tortfeasor to " 'fair notice not only of the conduct that will subject him [or her] to punishment, but also of the severity of the penalty that a State may impose.' " ' " (*Roby*, at p. 712.)

The United States Supreme Court has articulated "a set of substantive guideposts that reviewing courts must consider in evaluating the size of punitive damages awards [under the due process clause of the Fourteenth Amendment]: '(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.' " (*Nickerson I, supra*, 63 Cal.4th at pp. 371–372, quoting *State Farm, supra*, 538 U.S. at p. 418; accord,

46

*Contreras-Velazquez v. Family Health Centers of San Diego, Inc.* (2021) 62 Cal.App.5th 88, 104 (*Contreras-Velazquez*).)

However, when challenging a punitive damages award as excessive under state common law, the test for evaluating such an award is slightly different. (*Neal, supra,* 21 Cal.3d at p. 928.) The factors are: (1) the reprehensibility of the defendant's acts, (2) the amount of the compensatory damages award and its proportion to the punitive damages award, and (3) the financial condition of the defendant at the time of trial. (*Ibid.*)

Our high court has noted the difference in the standards of review depending on whether a challenge to a punitive damages award is based on due process grounds or state common law grounds: "In deciding whether an award of punitive damages is constitutionally excessive under *State Farm* and its predecessors, we are to review the award de novo, making an independent assessment of the reprehensibility of the defendant's conduct, the relationship between the award and the harm done to the plaintiff, and the relationship between the award and civil penalties authorized for comparable conduct." (*Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1172 (*Simon*).) This " '[e]xacting appellate review' is intended to ensure punitive damages are the product of the ' " 'application of law, rather than a decisionmaker's caprice.' " ' " (*Id.* at p. 1172, quoting *State Farm, supra,* 532 U.S. at p. 418.)

"But when no federal due process issue is involved, as when awards are reviewed for excessiveness under *state* law, the high court's decisions do not forbid greater deference to jury verdicts or trial court judgments." (*Simon, supra,* 35 Cal.4th at p. 1172, fn. 2.) "If no constitutional issue is raised, the role of the appellate court . . . is merely to review the trial court's 'determination under an abuse-of-discretion standard' " (*Cooper Industries,*

*supra,* 532 U.S. at p. 433); with findings of historical fact reviewed for substantial evidence (*Simon*, at p. 1172).

C.      *Reprehensibility*

In challenging the remitted punitive damages award of $652,720 against Chawla, defendants argue it violated his due process rights because his conduct involved "low to moderate" reprehensibility. They therefore argue his punitive damages award should be reduced to $326,360, in line with the trial court's tentative decision, and equal to the amount of the awards against Oceanic Companies and Oceanic San Diego, which reflected a one-to-one ratio of punitive to compensatory damages.

Of the guideposts articulated by the United States Supreme Court, "the most important is the degree of reprehensibility of the defendant's conduct." (*Roby*, *supra*, 47 Cal.4th at p. 713; *Contreras-Velazquez*, *supra*, 62 Cal.App.5th at p. 105.) "In assessing reprehensibility, we must consider the following five factors: 'whether "[1] the harm caused was physical as opposed to economic; [2] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; [3] the target of the conduct had financial vulnerability; [4] the conduct involved repeated actions or was an isolated incident; and [5] the harm was the result of intentional malice, trickery, or deceit, or mere accident." ' " (*Contreras-Velazquez*, at p. 105, quoting *Roby*, at p. 713 and *State Farm, supra*, 538 U.S. at p. 419.)

We independently conclude the first reprehensibility factor is present because there is ample record evidence to show Chawla's conduct caused Medel physical harm in the form of severe emotional and mental distress, as we have already summarized, which led to insomnia, panic attacks, trouble breathing, palpitations, and a return of her childhood eating disorder. (See *Roby*, *supra*, 47 Cal.4th at p. 713 [noting the harm suffered by the plaintiff

was " 'physical' in the sense that it affected her emotional and mental health, rather than being a purely economic harm"]; accord *Tilkey v. Allstate Ins. Co.* (2020) 56 Cal.App.5th 521, 559 (*Tilkey*) ["Harm is physical when it affects emotional and mental health and is not purely economic."].) Further, the jury awarded her noneconomic damages for past and future pain and suffering, stress, anxiety, panic attacks, loss of sleep, depression, insomnia, and humiliation. As such, we conclude the first reprehensibility factor weighs heavily in favor of an aggravated punitive damages award.

We also conclude the second reprehensibility factor is present. It was objectively reasonable to infer that, as president and CEO of Oceanic Companies and as manager and member of the various Oceanic properties including Oceanic San Diego, Chawla's repeated acts of sexual misconduct against Medel, including about a month before she was wrongfully terminated, would affect her emotional well-being. His conduct therefore " 'evinced an indifference to or a reckless disregard of the . . . safety of others,' " as also confirmed by the testimony of Gilbert, Oceanic Companies' director of human resources. (*Roby*, *supra*, 47 Cal.4th at p. 713, quoting *State Farm*, *supra*, 538 U.S. at p. 419.)

The third reprehensibility factor is also present, inasmuch as Medel was a "relatively low-level employee" (*Roby*, *supra*, 47 Cal.4th at p. 713) who depended on Oceanic and Chawla not only for a job but *also* for a place to live, as she earned $13.50 per hour, stayed in an Oceanic hotel during the majority of her employment, and was told that, if she "lost" her job, she also would lose her housing. This evidence supports the conclusion that Medel " 'had financial vulnerability' " under the third reprehensibility factor. (*Roby*, at p. 713, quoting *State Farm*, *supra*, 538 U.S. at p. 419.)

49

The fourth reprehensibility factor is also present, as Chawla subjected Medel to repeated acts of sexual misconduct and sexual harassment, including about a month before her termination, when he sat on the bed in her apartment, told her he loved her, and suggested they, along with Briceno, stay in for the night rather than go out as planned. This incident is in addition to two incidents in which he sought to engage Medel in group sex with Briceno, the incident when he asked Medel to undress and join him and Briceno in a hot tub, among others we previously described. Thus, Chawla's conduct was not an "isolated incident." (*State Farm*, *supra*, 538 U.S. at p. 419; cf. *Roby*, *supra*, 47 Cal.4th at pp. 713–714 [concluding this factor was missing because, although the plaintiff's supervisor's discriminatory disciplinary actions were repeated, there was no indication of repeated wrongdoing by the corporate defendant].)

The fifth factor tends to be "of little value in assessing a California punitive damages award because 'accidently harmful conduct cannot provide the basis for punitive damages under our law.'" (*King*, *supra*, 53 Cal.App.5th at p. 729, quoting *Simon*, *supra*, 35 Cal.4th at p. 1181.) The jury nonetheless found by clear and convincing evidence that Chawla engaged in conduct with "malice" and "oppression" as defined in Civil Code section 3294, subdivision (c)(1) and (2), respectively, a finding defendants have not challenged on appeal. The conduct at issue here was not a "mere accident." (*State Farm*, *supra*, 538 U.S. at p. 419.)

In support of their claim for a further reduction of the punitive damages against Chawla equal to a one-to-one ratio of punitive to compensatory damages, defendants claim Chawla's conduct was on the "low to moderate" range of reprehensibility. Defendants, again, argue Medel was not the victim of rape or sexual intercourse. We have already expressed our

50

view of this argument, and need not repeat our comments here. Defendants also rely on the trial court's finding in its new trial order that their conduct was "not so severe" because Medel accepted employment with Oceanic despite her "knowledge of [d]efendant's unusual co-mingling of personal and business practices" and she herself "participated in many of the same practices she criticized at trial." Counsel for defendants doubled down on this contention at oral argument by going so far as to state Medel "assumed the risk" of sexual harassment by not quitting her job. We reject this archaic contention, too. But relevant here, the trial court's focus on Medel's asserted conduct, and not that of Chawla's, in determining *his* reprehensibility was legal error.

Reprehensibility involves the tortious conduct of a *defendant*, not the victim plaintiff. (See *State Farm*, *supra*, 538 U.S. at p. 418 [the "degree of reprehensibility" is based on the "defendant's misconduct"]; accord *Roby*, *supra*, 47 Cal.4th at p. 713; *Bankhead v. ArvinMeritor, Inc*. (2012) 205 Cal.App.4th 68, 87 (*Bankhead*) ["[A] defendant's degree of reprehensibility for punitive damages purposes is [not] affected by whether the conduct of others was concurrently responsible for the plaintiff's injuries. Rather, for the purpose of the punitive damages analysis, the proper role of the jury's finding assigning [a defendant] a low percentage of liability is to reduce the amount of compensatory damages with which the amount of punitive damages is compared, when considering the ratio between the two. . . . Thus, [the defendant's] low percentage of liability for compensatory damages may reduce [his] punitive damages exposure, but not" by reducing his degree of reprehensibility.].)

Further still, we fail to see how Medel's knowledge about "the [partying] environment she was entering" when she accepted employment at Oceanic excuses or minimizes the gravity of the repeated sexual harassment

and sexual misconduct she endured by Chawla, or render his conduct and the conduct of her employers, Oceanic Companies and/or Oceanic San Diego, less reprehensible.

To the contrary, there was evidence supporting the inference that defendants used Briceno to recruit young woman like Medel to work for Oceanic Companies, who were then subjected to sexual advances by Chawla. Fakhreddine worked for Oceanic Companies for four months before being terminated just prior to Medel's hiring. Like Medel, Fakhreddine also traveled to Las Vegas with Chawla, Chokshi, and Briceno prior to her employment, where she was "sexually assaulted" by Chokshi while she was in bed, offered cocaine by Briceno, and was made to feel "really uncomfortable" after both Chawla and Briceno told her they were "horny." And on Fakhreddine's first day of work, Chawla, Chokshi, and Briceno told her they wanted to take her to lunch. But rather than eat, they consumed alcohol and pressured Fakhreddine to join them. During their "lunch," Chawla commented, "[T]omorrow is your first official day working for us, so I can still hit on you today." Afterwards, Chawla and Briceno invited Fakhreddine to go back to the hotel with them, inferably for group sex, with Briceno exclaiming she was "horny."

This "me-too" evidence, and the inferences derived from it, further support the punitive damages award against Chawla. (See *Pantoja v. Anton* (2011) 198 Cal.App.4th 87, 92, 109–110 ["me-too" evidence is "evidence of the employer's alleged gender bias in the form of harassing activity against women employees other than the plaintiff," and concluding such evidence was relevant to prove the defendant's intent when he touched other employees, and to rebut the defense evidence that the defendant had a policy of not tolerating harassment in the workplace]; *Johnson v. United Cerebral*

52

*Palsy/Spastic Children's Foundation* (2009) 173 Cal.App.4th 740, 760 ["me-too" evidence was admissible in a FEHA claim for pregnancy discrimination to show "intent or motive, for the purpose of casting doubt on an employer's stated reason for an adverse employment action"].)

In sum, we independently conclude the trial court erred when it focused on Medel's asserted conduct and not that of Chawla's in determining *his* reprehensibility. Substantial evidence supports the conclusion that all the reprehensibility factors were present in this case, and that Chawla's conduct was moderately to highly reprehensible.

D. *Disparity Between Actual Harm and Punitive Damages*

The second constitutional guidepost is "the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award." (*State Farm, supra,* 538 U.S. at p. 418.) While declining to impose a "bright-line ratio which a punitive damages award cannot exceed," the high court in *State Farm* concluded that "few awards exceeding a single-digit ratio between punitive and compensatory damages . . . will satisfy due process." (*Id.* at p. 425.)

Here, prior to our reinstatement of the future lost income awards, the ratio of Medel's punitive damages to actual damages as to Chawla was two to one. Defendants argue the maximum constitutionally permissible ratio is one-to-one. We are not persuaded.

As we have noted, all the reprehensibility factors are present in the instant case and Chawla's conduct in particular was on the moderate to high end of reprehensibility, as the jury ostensibly found when it initially awarded Medel $2 million in punitive damages against Chawla, or twice the award it rendered against Oceanic Companies and Oceanic San Diego; and when the trial court, in ruling on the new trial motion and upon further reflection,

determined that a ratio of two-to-one of punitive to compensatory damages was proper. (See *Gore, supra*, 517 U.S. at p. 582 ["we have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual *and potential* damages to the punitive award"]; *Colucci v. T-Mobile USA, Inc.* (2020) 48 Cal.App.5th 442, 459 [our conclusion that a 1.5-to-one ratio between punitive and compensatory damages was the federal constitutional maximum when the corporate defendant's reprehensibility was in the low to moderate range of wrongdoing and the plaintiff received a substantial noneconomic damages award]; *Sierra Club Foundation v. Graham* (1999) 72 Cal.App.4th 1135, 1162–1163 [affirming a punitive damages award that was three times the compensatory award due to the defendant's reprehensibility]; cf. *Roby, supra*, 47 Cal.4th at pp. 718–719 [finding a one-to-one ratio of punitive to compensatory damages was the constitutional maximum because the corporate defendant's reprehensibility was on the low end, it's conduct was limited to one incident, and the jury awarded the plaintiff $1.905 million in compensatory damages].)[19]

In addition, we conclude the trial court properly exercised its discretion as to Chawla when it set a two-to-one ratio in the weighing of his reprehensibility. (See *Moore v. American United Life Ins. Co.* (1984) 150 Cal.App.3d 610, 637–638 [noting that a jury could award punitive damages

[19] The third constitutional guidepost compares the punitive damages award to civil penalties authorized or imposed in similar cases. (*State Farm*, *supra*, 538 U.S. at p. 428.) Defendants have not raised this issue on appeal, and thus we do not consider this factor in determining the constitutionality of the punitive damages award against Chawla. (See *Tilkey, supra*, 56 Cal.App.5th at p. 559 [relying only on first two guideposts in determining whether the punitive damages award satisfied due process of law].)

not only to punish the defendant for past acts but also to "get [the] defendant's attention" to stop defendant's "invidious" behavior].) And, because we have reinstated the $60,000 future lost income award against Chawla, and Medel has cross-appealed the remittitur of the jury's punitive damages award, we will also modify the punitive damages award against Chawla to preserve the two-to-one ratio of punitive to compensatory damages set by the trial court. Accordingly, we reinstate $120,000 of the remitted punitive damages against Chawla, for a total of $772,720. (Cf. *Johnson v. Monsanto Co.* (2020) 52 Cal.App.5th 434, 462 [reducing the award of punitive damages to maintain the one-to-one ratio with compensatory damages set by the trial court after court reduced award of future noneconomic damages]; *Grimshaw v. Ford Motor Co.* (1981) 119 Cal.App.3d 757, 823–824 [recognizing its authority to increase the punitive damages award after it had been remitted by the trial court, but declining to do so because the defendant faced "potential liability for punitive damages in other cases involving the same tortious conduct"], disapproved on another ground as stated in *Kim v. Toyota Motor Corp.* (2018) 6 Cal.5th 21, 38, fn. 6.)[20]

E.      *Financial Condition*

Defendants also argue that, under our state's common law, Medel failed to proffer sufficient evidence of their financial condition at the time of trial to support the remitted punitive damages awards.

---

[20]     Because the trial court also found a one-to-one ratio of punitive to compensatory damages was appropriate for the separate punitive damage awards against Oceanic Companies and Oceanic San Diego, and Medel has cross-appealed the remittitur of the jury's punitive damages award against these defendants, for the same reason we modify these two awards by $60,000 each to $386,360.

1. *Guiding Principles*

Evidence of a defendant's financial condition is a prerequisite to an award of punitive damages. (*Adams v. Murakami* (1991) 54 Cal.3d 105, 110 (*Adams*).) "A reviewing court cannot make a fully informed determination of whether an award of punitive damages is excessive unless the record contains evidence of the defendant's financial condition." (*Ibid.*) "While 'there is no rigid formula and other factors may be dispositive especially when net worth is manipulated and fails to reflect actual wealth,' net worth is often described as 'the critical determinant of financial condition.' " (*Farmers & Merchants Trust Co. v. Vanetik* (2019) 33 Cal.App.5th 638, 648.) The plaintiff has the burden to show the defendant's financial condition at the time of trial. (*Adams*, at p. 123; *Vanetik*, at p. 650 [an award of punitive damages requires evidence of the defendant's "current financial condition[ ]"]).

"The determination of whether an award is excessive is admittedly more art than science. 'The channeling of just the correct quantum of bile to reach the correct level of punitive damages is, to put it mildly, an unscientific process complicated by personality differences.' [Citation.] However, when provided with evidence of a defendant's financial condition, the reviewing court can at least reach a reasonably informed decision. Without such evidence, a reviewing court can only speculate as to whether the award is appropriate or excessive." (*Adams, supra,* 54 Cal.3d at p. 112.)

"Accordingly, there is no one particular type of financial evidence a plaintiff must obtain or introduce to satisfy its burden of demonstrating the defendant's financial condition. Evidence of the defendant's net worth is the most commonly used, but that metric is too susceptible to manipulation to be the sole standard for measuring a defendant's ability to pay." (*Soto*, *supra*,

239 Cal.App.4th at p. 194.) "Yet the 'net' concept of the net worth metric remains critical." (*Ibid.*) " 'Thus, there should be some evidence of the defendant's actual wealth' [citation], but the precise character of that evidence may vary with the facts of each case." (*Id.* at pp. 194–195.)

2. *Chawla*

Chawla testified regarding his own financial condition at the time of trial and the financial condition of Oceanic Companies and Oceanic San Diego.

As to his own financial condition, Chawla testified he owned a home valued at about $3 to $3.5 million, but that it was encumbered by a first trust deed in the amount of about $2.1 million and a second trust deed of about $1.9 million; that he had used his home as collateral to obtain a loan to acquire Oceanic Companies' "office building"; that in 2021 he sold a home in his own neighborhood for $1.5 million, netting about $300,000, although he could not "specifically remember" the exact number; that in the same year, he also sold a home in Bonita for about $1.1 million, netting proceeds of about $150,000 to $200,000; and that he personally paid a monthly mortgage of about $2,061 on a home located on "F Street" in San Diego that he had recently transferred from his name to Oceanic Victorville, LP, with a value of about $600,000 to $650,000, encumbered by a mortgage of about $400,000, resulting in about $200,000 to $250,000 in equity.

Regarding his various Oceanic businesses, Chawla testified that he was sole owner of "O Fresno, LLC," the general manager of Oceanic Fresno, LP, which owned a hotel in Fresno worth about $2.5 to $3 million, encumbered by a loan of about $2 million; and that his interest in the Oceanic Fresno limited partnership was roughly 50 percent, as best he could remember, and estimated the equity in this hotel was between $250,000 and $500,000.

Chawla also had about an 80 percent ownership interest in Ocnic San Diego, LLC, the general partner of defendant Oceanic San Diego. Oceanic San Diego owned a hotel in Mission Valley that sold in 2016 for about $2 million, with Chawla receiving assets from the sale of about $1.6 million. Chawla then used those assets to acquire a hotel in Sacramento called Lions Gate, which was owned by Oceanic Victorville, LP. He estimated his membership interest in this limited partnership was about 79 percent. He subsequently sold the Lions Gate hotel, resulting in net proceeds of about $1 million.

Chawla also had an ownership interest in Ocnic El Cajon, LLC, which was the general partner of Oceanic El Cajon, LP, which entity used to own the Rodeway Inn in El Cajon where Medel lived for several months during her employment at Oceanic. Chawla estimated the El Cajon hotel was sold sometime in 2017 or 2018; that his interest in Ocnic El Cajon, LLC was 79 percent; and that the sale of the hotel generated profits of about $800,000.

Chawla had a 90 to 95 percent ownership interest in Ocnic Marina, LLC, which owned a hotel in La Jolla that it acquired for $7 million and which had outstanding encumbrances between $6 to $6.5 million. Chawla was unsure of the value of this hotel because it had been shut down for "almost three and a half years."

When questioned about Oceanic Victorville, LLC, Chawla claimed it had never owned assets; and that Oceanic Anaheim, LLC used to own a hotel in Anaheim called "Studio 6," which was sold in 2018 or 2019 and generated profits between $1.5 and $1.7 million.

Chawla also was asked about Oceanic San Ysidro, LLC, the general partner of Oceanic San Ysidro, LP; and Oceanic Morro Bay, LLC., the general partner of Oceanic Morro Bay, LP, which owned a hotel in Morro Bay.

Regarding the Morro Bay property, it was bought for about $6.2 million, and Chawla estimated it was then worth about $4.5 to $5 million.

Regarding Oceanic SLO, LLC, it was the general partner of Oceanic SLO, LP, which owned a hotel and ground lease in San Luis Obispo that it purchased for $7 million, with a mortgage in the range of about $5.5 to $6 million. Similar to the Morro Bay property, Chawla had a 79 percent interest in this entity. He estimated its current value was less than what he paid for it.

Oceanic Antelope Valley, LLC was the general partner of Oceanic Coronado, LP, which owned a 17-room hotel in Coronado that Chawla valued between $7 and 7.5 million, with a mortgage "close to seven [million]." His ownership interest in this entity was about 74 or 75 percent; and he purchased the hotel for about $8 or $9 million, although he could not be certain of the amount.

Oceanic Alameda, LP owned a hotel in Alameda that was sold in 2018, which proceeds Chawla used to purchase the hotel in Coronado.

In 2021, he sold a Travelodge in Grand Junction, Colorado for $3.9 million, with net proceeds of about $1 million going to him as the sole owner of that property.

At the time of trial, Chawla had an interest in hotels located in San Diego, Fresno, Morro Bay, San Luis Obispo, and Coronado, among other locations. He also owned Oceanic National City, LLC, which owned "a warehouse" valued at about $200,000; and Oceanic SD, LLC (not to be confused with defendant Oceanic San Diego), which owned his "office building."

Regarding other assets, Chawla estimated he had about $100,000 in a 401k account; could not recall the balance in his checking account, but

claimed it was less than $100,000; denied having a savings account, or owning any expensive art or jewelry other than a "chain" necklace; and in 2021 earned a salary of $100,000 from Oceanic Enterprises, LLC, another entity solely owned by him. Before the pandemic, Chawla earned $15,000 per month, in addition to "distributions" from the hotels.

Chawla found it "hard" to determine his then-current net worth, but believed it was less than $5 million. Just before the pandemic, he estimated his net worth was between $7 and $8 million "or more"; and added that, because the hotel-industry was "starting to open up," he was optimistic his net worth would once again be back in the $7 to $8 million range.

In remitting the punitive damages against Chawla, the trial court credited his testimony that his net worth "diminished significantly" as a result of the pandemic. But the court failed to state how much his net worth had decreased.

We conclude the trial court, acting as a " 'thirteenth juror' " (*Boeken v. Philip Morris, Inc.* (2005) 127 Cal.App.4th 1640, 1689 (*Boeken*)), properly exercised its discretion to reweigh the evidence and resolve issues of credibility—a power denied to us—when it reduced the jury's punitive damages award against him to a two-to-one ratio of punitive to compensatory damages. (See *Fortman, supra,* 211 Cal.App.3d at p. 259 [in ruling on a new trial motion, a trial court's determination of whether damages were excessive " 'is entitled to great weight' because it is bound by the 'more demanding test of weighing conflicting evidence than our standard of review under the substantial evidence rule' "].) We further conclude the two-to-one ratio is reasonable in light of the reprehensibility of Chawla's conduct and the injury to Medel. (See *Bankhead, supra,* 205 Cal.App.4th at p. 77 ["[W]e review an award of punitive damages to determine whether the award is excessive as a

60

matter of law, or raises a presumption that it is the product of passion or prejudice."].)

Viewing the evidence in the light most favorable to the judgment, we also conclude there is substantial evidence of Chawla's net worth to support the punitive damages award. (See *Rufo, supra,* 86 Cal.App.4th at p. 625 [upholding a punitive damages award based on evidence that the defendant "is a wealthy man, with prospects to gain more wealth in the future"]; *Devlin v. Kearny Mesa AMC/Jeep/Renault, Inc.* (1984) 155 Cal.App.3d 381, 390 [upholding a punitive damages award equal to 17.5 percent of the defendant corporation's annualized net worth].) And in sum, we conclude the punitive damages award against Chawla, as modified, is reasonable in light of his wealth and the reprehensibility of his conduct. (See *Bankhead, supra,* 205 Cal.App.4th at p. 77 [" 'Because the purposes of punitive damages are to punish the wrongdoer and to make an example of him [or her], the wealthier the wrongdoer, the larger the award of punitive damages.' "].)[21]

3.     *Oceanic Companies*

As its president, CEO, and sole shareholder, Chawla estimated that Oceanic Companies' earned a profit of about $200,000 to $300,000 in 2020, which he described as a "hard" year due to the COVID-19 pandemic. In 2018 and 2019, Chawla estimated the company's annual profits were "possibl[ly] up to $2 million." Oceanic Companies also held the warehouse for some period of time, prior to transferring it (for unknown consideration) to Oceanic National City, LLC.

---

[21]    In light of our decision, we reject Medel's claim in her cross-appeal that the trial court erred in remitting the jury's punitive damages award against Chawla to reflect a two-to-one ratio of punitive to compensatory damages.

Oceanic Companies was also the payee on a promissory note of about $300,000; collected management fees, as Chawla did "a lot of consulting for other people that helped them acquire assets and flip assets"; and earned fees in managing the various Oceanic properties. Thus, Chawla could not be "sure" of the company's "monthly gross collections."

We conclude the trial court properly exercised its discretion when it remitted the punitive damages award against Oceanic Companies to a one-to-one ratio of punitive to compensatory damages. (See *Boeken*, *supra*, 127 Cal.App.4th at p. 1689; *Fortman*, *supra*, 211 Cal.App.3d at p. 259.) We further conclude the award, as modified to reflect that ratio, is not excessive as a matter of law, in light of the evidence that the company's annual profits in 2018 and 2019 averaged about $2 million, and that 2020's profits of only about $300,000 were atypical because of the pandemic.

4.    *Oceanic San Diego*

Chawla testified that Oceanic San Diego — one of Medel's former employers — was no longer in business; that he netted about $1.6 million from its 2016 sale of a Motel 6 in Mission Valley, which proceeds he then used to buy the Lions Gate hotel in Sacramento; that Oceanic San Diego issued its "final tax return" in either 2017 or 2018; and that at the time of trial, this entity had no assets, bank accounts, or employees. Oceanic San Diego thus contends that, because there is no evidence of its financial condition at the time of trial, the punitive damages award against it must be remitted to zero.

Medel contends Oceanic San Diego is estopped from arguing there was insufficient evidence of its financial condition because it failed to produce documents responsive to her subpoena, despite evidence of their existence. We agree.

62

A defendant who fails to comply with an order to produce records of the defendant's financial condition may be estopped from challenging a punitive damage award based on lack of evidence of financial condition to support the award. (*Corenbaum*, *supra*, 215 Cal.App.4th at p. 1337.) In *Corenbaum*, the defendant on appeal asserted there was insufficient evidence of his financial condition to justify a punitive damages award in any amount. During the bifurcated trial after a finding of liability, the defendant admitted being served with a subpoena to produce "all records in his possession, custody or control evidencing his 'current wealth, assets and liabilities.' " (*Id.* at p. 1322.) The defendant also admitted he produced no documents and stated he had "no assets or wealth and nothing to produce." (*Ibid.*) However, he later conceded "he had $300 in a savings account and had a bank statement or bankbook evidencing that account, but failed to produce it," explaining he did not realize the subpoena included such documents. (*Ibid.*) The jury awarded plaintiffs $40,000 in punitive damages ($20,000 each). (*Id.* at p. 1319.)

In holding the defendant was estopped from asserting the punitive damages award was excessive based on the lack of evidence of his ability to pay, the Court of Appeal in *Corenbaum* noted the defendant did not challenge the subpoena on appeal and failed to comply with the subpoena requiring him to produce at trial records of his financial condition. (*Corenbaum*, *supra*, 215 Cal.App.4th at pp. 1336–1337.)

Here, it appears the only documents Oceanic San Diego produced in response to the subpoena were tax returns for 2016 and 2017.[22] However,

_____

[22] In opposition to defendants' new trial motion, Medel's counsel stated under penalty of perjury that Oceanic San Diego only produced tax returns from 2016 and 2017.

the subpoena served on Oceanic San Diego also requested it produce the following documents:[23]

Nos. 2, 3, 4, and 5: "[F]inancial statements," "[e]very statement of net worth, profits and losses, income and expenses," and summaries of its assets and liabilities, from January 1, 2016, to the date of trial.

No. 7: "All statements of assets, liabilities, and/or net worth from or for any other entity that includes or incorporates the assets, liabilities, or net worth of DEFENDANT [Oceanic San Diego], or any portion thereof," from 2016 to the date of trial.

No. 12: "Appraisals of any business owned by DEFENDANT or any or all of [its] business assets, or those of any predecessor business or name, since January 1, 2016."

No. 13: "The sale or potential sale (including offers for sale, invitations to make offers, listings for sale, invitations for bids, internal memoranda analyzing the potential sale value) of any business in which DEFENDANT hold[s] an ownership interest as a going business . . ., from January 1, 2016, through the date of trial."

No. 14: "The sale or potential sale (including offers for sale, invitations to make offers, listing for sale, invitations for bids, internal memoranda

---

[23] Although the Oceanic San Diego subpoena did not request documents regarding the purported winding up of this entity's business, we merely note that nothing prevented defendants from introducing such documents into evidence, if they existed, to show that, at the time of trial, Oceanic San Diego was no longer a going concern, as Chawla testified. (See e.g., Soza & Jann, Cal. Practice Guide: Pass-Through Entities, ch. 5, § 5:701 ["Once the partnership has been completely wound up, it must file a certificate of cancellation on a form prescribed by the Secretary of State[,]"] citing Corp. Code, § 15902.03.)

analyzing the potential sale value), of *assets* of DEFENDANT from January 1, 2016, through the date of trial." (Italics added.)

At a minimum, Oceanic San Diego had an obligation to produce documents responsive to request Nos. 2, 3, 4, 5, and/or 14, in light of the evidence that it employed Medel as of late February 2017; that this entity sold a hotel sometime in 2016, netting Chawla about $1.6 million in profits; and that he used (some or all of) these assets to purchase another hotel (i.e., Lions Gate in Sacramento). It would also be surprising if Oceanic San Diego sold this hotel in 2016 without first obtaining an appraisal or a written offer or offers to purchase, such that those documents responsive to request Nos. 12 and 13 likely existed but were not produced.

Like the defendant in *Corenbaum* who failed to comply with a subpoena, Oceanic San Diego produced only two documents responsive to Medel's subpoena, despite evidence of the existence of potentially many more documents that also were responsive. As such, we conclude Oceanic San Diego failed to comply with the subpoena and is therefore estopped from asserting insufficiency of the evidence of its net worth to support a further reduction or elimination of the punitive damages award. (See *Corenbaum*, *supra*, 215 Cal.App.4th at pp. 1337–1338; *Fernandes v. Singh* (2017) 16 Cal.App.5th 932, 942 (*Fernandes*) ["A defendant is in the best position to know his or her financial condition, and cannot avoid a punitive damage award by failing to cooperate with discovery orders."].)

Defendants nonetheless contend the subpoenas Medel served on them (including Oceanic San Diego) were overbroad and sought voluminous documents not relevant to their financial condition. Defendants, however, never objected to the subpoenas in the trial court. Instead, the record shows defendants' counsel agreed to accept service of the subpoenas (§ 1987,

subd. (b) [acceptance of service of by an attorney of a party]) and respond accordingly, after the trial court repeatedly expressed concern about the timeliness of the evidence of defendants' financial condition to ensure there was no delay in the trial. In addition, although defendants *on appeal* claim that the subpoenas were overbroad and provided very little time for compliance, they do not directly challenge their validity, and for good reason: their failure to raise such objections in the trial court would likely preclude review of such issues on appeal. (See e.g., *Greenwich S.F., LLC v. Wong* (2010) 190 Cal.App.4th 739, 767 [failure to raise an issue in the trial court generally forfeits the claim of error on appeal].)

Instead, defendants blame Medel for not raising the compliance issue in the trial court, arguing she "never presented any objection [to the production] to the trial judge"; that she waited to make "post-facto objections" in opposition to the new trial motion; and thus, that "there was no indication of any subpoena issue before the opposing party or the court." We note, however, that defendants have failed to cite any authority showing Medel was precluded from raising estoppel in response to their argument in the new trial motion that there was insufficient evidence of Oceanic San Diego's financial condition to support the punitive damages award. (See *Fernandes*, *supra*, 16 Cal.App.5th at pp. 942–943 [a brief must contain " ' "meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error" ' "].) And the fact she waited to raise estoppel in post-trial motions did not excuse defendants' failure to object at trial to the subpoenas, in whole or in part. (See *Standon Co., Inc. v. Superior Court (Kim)* (1990) 225 Cal.App.3d 898, 901 [objections to a request for production of documents constitutes an implicit refusal to produce documents].)

Finally, defendants contend *Corenbaum* is inapplicable because the defendant there disobeyed a court order and produced no documents, whereas in the instant case there was no such order and defendants did produce about 5,000 documents. But a properly issued subpoena duces tecum is tantamount to a court order for production of financial condition documents. (See *Corenbaum, supra,* 215 Cal.App.4th at p. 1338 ["A subpoena 'is a writ or order directed to a person and requiring the person's attendance at a particular time and place to testify as a witness' (Code Civ. Proc., § 1985, subd. (a)), and may also require the production of documents in that person's control [citation]. Thus, for purposes of requiring attendance and the production of documents at trial, a subpoena is *equivalent* to a court order." (Italics added.)].)

Like the defendant in *Corenbaum* (and the defendants in similar cases),[24] Oceanic San Diego did not produce what appears to be many documents responsive to the subpoena, despite evidence of their existence.

---

[24] See e.g., *Garcia v. Myllyla* (2019) 40 Cal.App.5th 990, 995–997 [the defendants' failure to comply with a notice to appear, produce documents responsive to the plaintiffs' demand for documents, and/or their failure to object to the validity of the notice or the demand at trial precluded them from challenging the punitive damage award on the ground the plaintiffs failed to introduce evidence of the defendants' financial condition]; *Fernandes, supra,* 16 Cal.App.5th at p. 942 [the defendants' refusal to comply with the trial court's discovery order compelling them to produce evidence of their financial condition prevented them from challenging the amount of the punitive damages awards based on the lack of such evidence]; *Mike Davidov Co. v. Issod* (2000) 78 Cal.App.4th 597, 609 [the defendant was estopped from challenging the amount of the punitive damages award based on his failure to comply with a court order, and noting such disobedience "improperly deprived plaintiff of the opportunity to meet his burden of proof on the issue"].

We thus conclude Medel was excused from the requirement that she produce evidence of Oceanic San Diego's net worth at the time of trial to support the punitive damages award.[25]

## DISPOSITION

The jury's separate awards of future lost income, remitted to zero by the trial court, are reinstated to their original amounts as to each defendant. In addition, as a result of our reinstatement of the future lost income awards and the trial court's determination that a one-to-one ratio of punitive to compensatory damages was appropriate for Oceanic Companies and Oceanic San Diego, and a two-to-one ratio was appropriate for Chawla, we modify the punitive damages awards accordingly to reestablish the ratios set by the trial court: the separate punitive damage awards against Oceanic Companies and Oceanic San Diego are thereby each modified by $60,000 to $386,360, and as to Chawla by $120,000 to $772,720. The trial court is directed to amend the

---

[25] In their opening brief on appeal, defendants request we provide them "[i]nstructive guidance" on whether Medel is entitled to "add up" all the damage figures and recover such from *each* defendant, as opposed to what they claim is the " 'true' " award based on their joint liability for each category of damage. Defendants claim this guidance would facilitate the parties' potential settlement of the case. We do not offer advisory opinions on hypothetical facts, and thereby deny their invitation for "guidance" on this issue. (See *Benitez v. North Coast Women's Care Medical Group, Inc.* (2003) 106 Cal.App.4th 978, 991 ["[A] court should avoid advisory opinions involving hypothetical facts."].) In any event, we note the trial court instructed the jury with CACI No. 3934, which provides in part: "Plaintiff Rut Medel seeks damages from Defendants under more than one legal theory. However, each item of damages may be awarded only once, regardless of the number of legal theories alleged." We presume the jury understood and followed this instruction. (See *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 803–804 ["[a]bsent some contrary indication in the record, we presume the jury follows its instructions [citations] 'and that its verdict reflects the legal limitations those instructions imposed' "].)

judgment accordingly.  In all other respects the judgment and new trial order are affirmed.  Medel shall recover her costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1).)


DO, J.

WE CONCUR:


IRION, Acting P. J.


BUCHANAN, J.